The Honorable Barbara J. Rothstein

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

MICHAEL BROCK, et al,

9
                                         Plaintiffs,        CASE NO. 2:24-cv-00850-BJR

10              v.                                          **OPPOSITION TO MOTION TO
                                                           DISMISS**
11   CITY OF BELLINGHAM AND
     MAYOR SETH FLEETWOOD,
12
                                         Defendants.
13

14

15

16   NOW INTO COURT, through undersigned counsel, come Plaintiffs, Michael Brock, *et al*, who oppose

17   the Motion to Dismiss filed by City of Bellingham and Mayor Seth Fleetwood (collectively referred to

18   as "Defendants" or singularly as "the City" and "Mr. Fleetwood") as follows:

19                                      **INTRODUCTION**

20          Defendants' Motion to Dismiss is more akin to a Motion for Summary Judgment. Defendants

21   raise facts that are in dispute and refuse to accept as true the specific factual allegations made by

22   Plaintiffs. Plaintiffs 'factual allegations, which Plaintiffs assert are not "conclusory" but rather are

23   supported by judicially noticeable facts, must be accepted as true on a Motion to Dismiss.

24

25   Plaintiffs are suing for the deprivation of constitutional and federal statutory rights because their

26   constitutional right to enjoy public employment suddenly hinged upon the requirement to be injected

27   with EUA/PREP Act investigational drugs offered exclusively under a federally funded program that

28

SCHEXNAYDRE
LAW FIRM
2895 Hwy 190
SUITE 212
MANDEVILLE, LA 70471

were not licensed for any indication,[1] including the prevention and transmission of, or infection from, the coronavirus, which implicates several fundamental rights under the Fourteenth Amendment. In addition to not being licensed for any indication, the fact that the drugs do not prevent transmission or infection means they are not vaccines, and thus, the drugs are merely unwanted investigational medical treatments, which Plaintiffs claim are neither safe nor effective. So, essentially, Defendants' entire Motion to Dismiss rests upon Defendants disputing Plaintiffs' factual allegation that the subject shots are investigational drugs not licensed for any indication and are unwanted, ineffective, unsafe medical treatments. When those allegations are accepted as true, which is required on a Motion to Dismiss but which Plaintiffs nevertheless support with judicially noticeable documents, Defendants' motion fails.

As an introductory matter, Plaintiffs assert that it is important to be precise when discussing the drugs in question. The court should note that the "Pfizer -BioNTech COVID-19 Vaccine" (capital letter "V") drug is the formal name for Pfizer's EUA investigational drug. "Pfizer-BioNTech COVID-19 vaccine" (lowercase "v") means Pfizer's COVID-19 vaccine technology in general. COMIRNATY® is Pfizer's only FDA-licensed COVID-19 drug.

## RESPONSE TO DEFENDANTS' SPECIFIC ARGUMENTS

Defendants point to CDC publications for the proposition that the shots were "safe and effective *at reducing the risk of severe illness or death due to COVID-19.*" (Doc 17, p. 2.) First, Plaintiffs disagree with that factual statement and, thus, this is a contested issue that has no place in a Motion to Dismiss. Second, reducing severe illness or death is not the function of a vaccine. The purpose of a vaccine (under the definition in place when these shots were granted an EUA) is to provide immunity to a disease, not "lessen the effect" of it. The latter is a medical treatment, not a vaccine, as noted by the 9th Circuit in *Health Freedom v. Carvalho*, 22-55908 (9th Cir. June 7, 2024), and governments cannot mandate unwanted investigational or other medical treatments.

---

[1] Doc 10-4, p. 1, third paragraph, last sentence.

SCHEXNAYDRE
LAW FIRM
2895 HWY 190
SUITE 212
MANDEVILLE, LA 70471

**OPPOSITION TO MOTION TO DISMISS**

Defendants try to skirt this issue by claiming "no vaccine is 100% effective." (Doc 17, p.2.) That is not what the applicable definition of vaccine says when it states that a vaccine produces immunity to a disease. (See Exhibit A, p. 1, Definition of Vaccine before September 1, 2021, as compared to Exhibit A, p. 2, Definition of Vaccine after September 1, 2021.) The pre-September 1, 2021, definition says, "a product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease. Vaccines are usually administered through needle injections, but can also be administered by mouth or sprayed into the nose."[2] It does not say, "sometimes produces immunity to a disease." In any event, again, Defendants raise a factual issue that is in dispute and must be resolved in favor of Plaintiffs on a Motion to Dismiss.

Defendants again make a factual argument that conflicts with Plaintiffs' allegations when Defendants claim, "COVID-19 vaccines have proven highly effective at preventing the virus's spread and severe disease." (Doc 17, p. 2) Plaintiffs dispute that statement and note that it even conflicts with a statement in the Order that the Delta variant "resulted in breakthrough infections in some fully vaccinated individuals." (Doc 10-1, p. 2) Plaintiffs have alleged not only that the COVID-19 shots do not prevent the virus's spread (Doc 10, P 61-62), but that the drugs available to Plaintiffs were "investigational, without a legal indication to treat, cure, or prevent any known disease." (Doc 10, P 50.) Plaintiffs notified the court that these shots were so bad at "preventing transmission or infection" the CDC had to change the definition of "vaccine." (Doc 10, ¶ 64.) But instead of accepting that factual allegation as true on a Motion to Dismiss, Defendants actually ask the court to "disregard such allegations." (Doc 17, p. 10, FN 9) As justification, Defendants point to an inaccurate MMWR report from September 17, 2021 (16 days after the definition of "vaccine" was changed), which Plaintiffs dispute. Thus, while the report itself is judicially noticeable for purposes of authenticating the document,

---

[2] By contrast, the new definition of "vaccine" is: A preparation that is used to stimulate a body's immune response against diseases. Vaccines are usually administered through needle injections, but can also be administered by mouth or sprayed into the nose." (Exhibit A, p. 2)

SCHEXNAYDRE
LAW FIRM
2895 Hwy 190
SUITE 212
MANDEVILLE, LA 70471

-3-
OPPOSITION TO MOTION TO DISMISS

the facts and conclusions contained therein are not judicially noticeable because they are wrong and disputed by Plaintiffs. See *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S.Ct. 2615 (2019). Therefore, Plaintiffs object to the court taking judicial notice of the contents.

The City's Order claimed that the shots were "effective in reducing serious disease and hospitalizations." (Doc 17, p. 3.) Plaintiffs contest that statement and add that such a statement is an admission that the Order is a "medical treatment mandate" and not the mandate of an FDA-licensed "vaccine." In addition to there being a factual dispute about the efficacy of the drugs as "vaccines," the vials labeled as Pfizer-BioNTech COVID-19 Vaccine are not licensed for any legal indication and are classified by the FDA as investigational. Defendants cannot constitutionally mandate that individuals be injected with unlicensed drugs as a condition of continued public employment.

## INVESTIGATIONAL DRUG

Plaintiffs claim that all drugs available to them for compliance with Defendants' mandate were investigational drugs. (Doc 10, ¶ 15.) Defendants claim "the COVID-19 vaccine is not an 'investigational drug.'" That is the classic definition of a factual dispute that cannot be resolved on a 12(b)(6) motion. Defendants dispute the FDA's classification of the Pfizer-BioNTech COVID-19 Vaccine but do not explain why or how the FDA got it wrong. Defendants and Article III judges are not persons authorized by the U.S. Congress to assign a drug its classification nor approve it for a biologics license application under 21 U.S.C. § 355, which authority exclusively belongs to the Secretary of Health and Human Resources (21 U.S.C. § 321(d)). Defendants utilize creative wording by stating, "The Pfizer vaccine, which was indisputably available to Plaintiffs before the Order's December 3, 2021 vaccination deadline, was not "investigational" for the purposes of the EUA Act, but instead was fully approved by the FDA." (Doc. 17, p. 5.) Defendants speak to Pfizer's COVID-19 technology involving investigational and licensed drugs, not to a specific drug label. Drugs are regulated according to their labeling and not their formulation, and only vials bearing the marketed label "COMIRNATY®" are

SCHEXNAYDRE
LAW FIRM
2895 Hwy 190
SUITE 212
MANDEVILLE, LA 70471

-4-

OPPOSITION TO MOTION TO DISMISS

licensed by the FDA for general commercial marketing. In contrast, the Pfizer-BioNTech COVID-19 Vaccine is under investigational new drug application 19736,[3] and the FDA informed Defendants that they "clearly and conspicuously shall state this product has not been approved or licensed by FDA, but has been authorized for emergency use by FDA, under an EUA." (Doc 10-5, letter Y). Defendants cite to *Roberts v. Inslee*, in which Judge Rice disputed the FDA without explanation, stating the drug was "effectively FDA approved." This ruling violates the separation of powers doctrine because it does not give legal effect to the authority of Congress and the HSS Secretary to determine what is or is not an investigational drug. Similarly, the *Curtis v. Inslee* court, also cited by Defendants, also disputed the FDA's classification of the drug and implied the drugs were not under EUA, which conflicts with the EUA letters and the official notices published in the Federal Register.[4] (Docs. 10-4, 10-5) Defendants claim that the "the Pfizer[] and Comirnaty vaccines were identical in all but name" (Doc. 17, p. 5) is patently untrue[5] because they do not share laws, and laws are what concern this Court.

Defendants claim the right to engage in the criminal act of misbranding (21 U.S.C. § 331) by presenting an unlicensed drug as if it is licensed, with the intent of causing Plaintiffs to be injected with the drugs under the pretense that they are something other than their labeling. Moreover, despite Defendants not addressing the FDA's exclusive authority to assign a drug its classification, Defendants do not explain how a drug can be both FDA-approved and under EUA since those two statuses cannot legally coexist for the same drug because an EUA is only authorized when licensed drugs are not available. (21 U.S.C. §§360bbb-3(2)(A),(C)(3)) The HHS Secretary issued EUAs for all times material

---

[3] "Pfizer Inc. must submit to Investigational New Drug application (IND) number 19736" and "The products are legally distinct" Doc 10-5, 8-23-21 EUA Letter.

[4] It should be noted that the *Roberts* and *Curtis* cases are on appeal to the Ninth Circuit.

[5] The FDA only stated that the drugs shared formulation on paper as of August 23, 2021. However, Plaintiffs will prove at trial that Pfizer's stockpile of its investigational drugs did not all share the same formulation, as many variations were manufactured before and after that date under its legal investigational status.

SCHEXNAYDRE
LAW FIRM
2895 Hwy 190
SUITE 212
MANDEVILLE, LA 70471

-5-
OPPOSITION TO MOTION TO DISMISS

for Pfizer's COVID-19 drugs.[6]  Defendants would have this court believe that once a formulation receives its marketing license, then existing vials of unlicensed EUA drugs are automatically converted into a licensed product. By doing so, Defendants purport to change the federal scheme regulating the $600 billion pharmaceutical industry so they can escape liability when mandating the use of unlicensed investigational drugs as if they are FDA-approved according to their labeling. This Court is not required to accept Defendants' "unreasonable inferences or conclusory legal assertions cast in the form of factual allegations." *Harris v. U.S. BankCorp*, 2:19- CV-00291-BJR, 2019 WL 5536402, at *2 (W.D. Wash. Oct. 25, 2019) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553–56 (2007)). Defendants' attempt to apply COMIRNATY®'s license to the Pfizer-BioNTech COVID-19 Vaccine is in violation of federal drug labeling laws which cannot be condoned or adopted by this court.[7] Moreover, the Ninth Circuit provides Defendants with the correct manner to dispute the FDA's classification of Pfizer-BioNTech COVID-19 Vaccine which "is to challenge the Commissioner's ruling under the Administrative Procedure Act, 5 U.S.C. § 701-706." *Carnohan v. United States*, 616 F.2d 1120, 1121 (9th Cir. 1980). However, such a challenge would only apply prospectively, not retroactively, because the drugs were at all times material introduced into commerce and administered under laws regulating investigational new drugs. After all, a person who received the investigational version cannot file a legitimate lawsuit claiming they "effectively" received COMIRNATY®.

---

[6] EUAs for Pfizer-BioNTech COVID-19 Vaccine was issued on (August 23, 2021), (September 22, 2021), (October 20, 2021), (November 19, 2021), (December 9, 2021), (December 16, 2021), (January 3, 2022), (March 29, 2022), (May 17, 2022), (June 17, 2022), (July 8, 2022), (August 31, 2022), (October 12, 2022), (December 8, 2022), (March 14, 2023), (April 18, 2023), and on (April 28, 2023)

[7] Unlicensed use means using a medical product for a purpose not licensed by the FDA (e.g., legal indication, usage, and contraindications) according to the product's labeling. Legal indication means the FDA-licensed purpose of the drug under 21 U.S.C. § 355(a) and labeled according to 21 CFR 201.57(c). An investigational drug does not have a legal indication to treat, cure, or prevent any known disease or virus. It can never come under a mandate because the U.S. Congress expressly forbids investigational drugs from coming under nonconsensual use.

SCHEXNAYDRE
LAW FIRM
2895 HWY 190
SUITE 212
MANDEVILLE, LA 70471

-6-
**OPPOSITION TO MOTION TO DISMISS**

**ENFORCEABLE FEDERAL RIGHT**

Defendants claim that "Plaintiffs' claim also fails because they have not identified any federal right enforceable under § 1983" and try to distinguish between a violation of a *right* with a violation of a *law*. (Doc 17, p. 5.) The rights under the EUA statute and the PREP Act are federal rights. Moreover, and something COB ignores, is that a § 1983 claim is also the vehicle to enforce the deprivation of constitutional rights.

Curiously, even though Defendants cite to *Gonzaga*, they do not discuss the recent Supreme Court case of *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023), which interpreted *Gonzaga*, and even though Plaintiffs cited *Talevski* in the Complaint (Doc 10, ¶ 162, FN 46). Plaintiffs have alleged that rights-creating language as discussed in *Talevski* exists in both the EUA statute (the option to accept to refuse) and the PREP Act (the right to be informed of the voluntary nature of the program). The deprivation of these rights forms the basis of an enforceable § 1983 action. Moreover, *Talevski's* 7-2 ruling involved the Spending Clause and contracts issued by the federal government under that Clause, having rights creating language for individuals in the spending statute, as in the case at bar.[8]

The *Talevski* Court held,

> *Gonzaga* sets forth our established method for ascertaining unambiguous conferral. Courts must employ traditional tools of statutory construction to assess whether Congress has "unambiguously conferred" "individual rights upon a class of beneficiaries" to which the plaintiff belongs. [citations omitted] Notably, it must be determined that "Congress intended to create a federal right" *for* the identified class, not merely that the plaintiffs fall "within the general zone of interest that the statute is intended to protect" *Gonzaga*, 536 U.S., at 283. This paradigm respects Congress's primacy in this arena and thus vindicates the separation of powers. *Id.*, at 286. Id., at 284, 287. Conversely, we have rejected § 1983 enforceability where the statutory provision "contain[ed] no rights-creating language"; had "an aggregate, not individual, focus"; and serve[d] primarily to direct the [Federal Government's] distribution of public funds." *Id.*, at 290
> We have held that the *Gonzaga* test is satisfied where the provision in question is

---

[8] 45 C.F.R. § 46.122 applies to all federal funding of investigational medical products. 10 U.S.C. § 980 applies to all DoD funding of investigational medical products irrespective of who is offering the product and who is considering the product's use.

SCHEXNAYDRE
LAW FIRM
2895 HWY 190
SUITE 212
MANDEVILLE, LA 70471

-7-
**OPPOSITION TO MOTION TO DISMISS**

"phrased in terms of the persons benefited" and contains "rights-creating," individual-centric language with an "unmistakable focus on the benefited class."

The Court held that the "right to be free from . . . any physical or chemical restraints" and the right to advanced notice of discharge provisions of the FNHRA statute "meet[s] this test," stating that "This framing is indicative of an individual 'rights-creating' focus. *Gonzaga*, 536 U. S., at 284."

The *Talevski* Court clarified what Defendants confuse on the issue of private right of action and § 1983. The Court clarified that a private right of action and a § 1983 action are mutually exclusive. If Plaintiffs have one, they do not have the other. Conversely, Defendants incorrectly argue that because "none of these authorities contain a private right of action enforceable by Plaintiffs under § 1983, the Court should dismiss their claim" (Doc. 17, p. 6). That is directly opposite of the U.S. Supreme Court's pronouncement. So, in every place of Defendants' brief where they argue that a statute does not provide a private right of action, Defendants establish that that statute is a candidate for a § 1983 action if it contains rights-creating language.

While the federal statutes involved in the instant action and *Talevski* differ, the legal analysis is identical. Plaintiffs at bar claim that Congress created a right for them under 21 U.S.C. 360bbb-3(e)(1)(A)(ii)(III), in pertinent part:

> The Secretary…shall establish…conditions…to ensure that individuals to whom the product is administered are informed…of the option to accept or refuse administration of the product…

This language "unambiguously confers" the right to be informed of the option to accept or refuse administration of the product. Also, it speaks in terms of "individual rights upon a class of beneficiaries" to which the plaintiff belongs. The provision actually uses the word "individuals" when describing to whom the right is conferred. The class of beneficiaries are those contemplating the "administration of the product." Congress intended to create a federal right for the identified class by describing the right the way it did.

SCHEXNAYDRE
LAW FIRM
2895 HWY 190
SUITE 212
MANDEVILLE, LA 70471

-8-

OPPOSITION TO MOTION TO DISMISS

### (i) The EUA Statute - 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III)

In balancing the government's interests with individual rights during a declared national emergency, Congress unequivocally created statutory entitlements for individuals considering the use of EUA investigational drugs. The statutory framework created by Congress encompasses the right to be informed of the risks, benefits, and alternatives of the product, aligning with the principle of informed consent established under 45 C.F.R. Part 46; the right to be notified of the option to accept or refuse the product, respecting the societal liberty interest in refusing unwanted investigational drug treatments recognized in *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261 (1990) of the entitlement to make autonomous health decisions, echoing the Supreme Court's affirmation of the importance of personal autonomy in medical decision-making, with which the Supremacy Clause preempted Defendants from interfering by issuing the Order relying exclusively on the use of EUA investigational drugs.[9] Notably, Congress declared that even in the face of chemical, biological, radiological, nuclear, or pandemic threats,[10] the government's legitimate interest includes safeguarding individual autonomy, which Congress, granting the HHS Secretary authority to introduce into commerce unlicensed drugs during a declared emergency simultaneously restricted that authority from requiring any person to participate, including receiving the product.[11] Furthermore, the Secretary's authority under the EUA Statute is nondelegable. By providing a federally secured right to refuse, Congress has created a "legitimate claim of entitlement" as defined in *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 576-77, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), *overruled in part and on other grounds in Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), elevating the right to a protected property interest

---

[9] "[Congress's] intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest. . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)

[10] The U.S. Congress enacted "Project Bioshield" to respond to CBRN events and later included pandemics under the law. Public Law No: 108-276 (07/21/2004)

[11] 21 U.S.C. §360bbb-3(l)

SCHEXNAYDRE
LAW FIRM
2895 Hwy 190
SUITE 212
MANDEVILLE, LA 70471

-9-

**OPPOSITION TO MOTION TO DISMISS**

under the Due Process Clause. The statutory construct reflects a balance between Defendants issuing public health Orders and individual liberty, resonating with the Supreme Court's consistent emphasis on protecting fundamental rights against government intrusion, as exemplified in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), which, when applied to the instant action, protects the private choices of individuals about whether to use investigational drugs or medical treatments offered under a federally funded program. The right to refuse unwanted investigational drugs and treatments is protected under the Fourteenth Amendment, which was clearly established when the Order was issued, as discussed below.

In *Cruzan*, the Supreme Court was unambiguous in its language, stating, "The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment." *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261 (1990). In the instant action, Defendants misrepresent their authority when issuing a health Order mandating that Plaintiffs become patients and that they cannot refuse unlicensed investigational drugs or unwanted medical treatment as a condition of public employment. Such an Order shocks the conscience and is reckless.

**(ii) 45 CFR 46, FWA, and 10 USC 980**

Defendants assert that Plaintiffs have no claim under the FWA, 10 U.S.C. 980, 45 CFR Part 46, and the Belmont Report because "[t]he Order involved no research whatsoever and Plaintiffs do not allege otherwise." However, Plaintiffs specifically alleged that research activities were required under the CDC Vaccination Program, to which all available COVID shots were subject. (Doc 10, ¶ 16; FN 2, 3, 4, 5). Moreover, at trial, Plaintiffs will produce former HHS and FDA employees as expert witnesses to demonstrate to a jury that the CDC COVID-19 Vaccination Program required all persons to consent to become human subjects for federal research, that the drugs were purchased with DoD funding, and how those facts relate to laws providing Plaintiffs with statutory entitlements to refuse without penalty or pressure. Defendants' claim that "The Order involved no research whatsoever" is patently untrue as clearly outlined under 21 U.S.C. §360bbb-3(e)(1)(A)(iii) and the "conditions of authorization" under the

**OPPOSITION TO MOTION TO DISMISS**

SCHEXNAYDRE
LAW FIRM
2895 Hwy 190
SUITE 212
MANDEVILLE, LA 70471

FDA's August 23, 2021 EUA letter (Doc 10-5), specifically Section III letters F, G, N, T, U, and V, all of which meet 45 CFR Part 46 requirements regarding "research" because those activities are "designed to develop or contribute to generalizable knowledge" of the product ( 45 CFR 46.102(l)). These are factual allegations that cannot be resolved on a motion to dismiss.

### (iii) PREP Act

The PREP Act specifically incorporates the entirety of the FDCA, including 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III), under its express preemption language. Therefore, the requirement to accept Plaintiffs' chosen option under the EUA Statute is incorporated into the PREP Act because the drugs were listed as countermeasures under the PREP Act, which means the rights creating language under the EUA Statute has been retained under the PREP Act subject to § 1983 enforcement.

### (iv) Supremacy Clause

Plaintiffs do not allege a private right of action under the Supremacy Clause. Rather, they allege that the EUA Statute under the Supremacy Clause and the PREP Act's express preemption language prohibit a city mayor from applying the Order requiring the exclusive use of EUA/PREP Act investigational drugs (Doc 10, ¶¶ 116, 163-165, 179, 266.). Those facts demonstrate that the Order was issued under *ultra vires* authority, violating Plaintiffs' Fourteenth Amendment rights.

### (v) Provider Agreement

Defendants' claim that the Provider Agreement "does not apply to Plaintiffs or Defendants" is incorrect. (Doc. 17, p. 8) The CDC COVID-19 Vaccination Program (CDC Program) is a federally funded program in which the Provider Agreement established the rights of Plaintiffs to learn of the risks, benefits, and alternatives of the investigational drugs and of Plaintiffs' right to accept or refuse the drugs without incurring costs, penalties, or losing a benefit to which they were otherwise entitled. The Supreme Court holds that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408

SCHEXNAYDRE
LAW FIRM
2895 HWY 190
SUITE 212
MANDEVILLE, LA 70471

-11-

OPPOSITION TO MOTION TO DISMISS

U.S. 564 (1972) It also held that "[p]roperty interests, of course, are not created by the Constitution. Rather, they are created, and their dimensions are defined, by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in *Goldberg v. Kelly*, 397 U.S. 254 (1970), had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them." Under the *Talevski* ruling, Plaintiffs have a § 1983 cause of action under the federal program when Defendants deprived Plaintiffs of their expected benefits. Plaintiffs clearly alleged that Mr. Fleetwood established a policy that deprived Plaintiffs of their expected and promised benefits under the Provider Agreement (Doc 10, ¶ 99.).

## SUBSTANTIVE DUE PROCESS

Plaintiffs claim the fundamental right to refuse an investigational drug and to refuse unwanted medical treatment. (Doc 10, ¶ 69.) Defendants commanding that public employees' skin be pierced with a needle containing an investigational drug not licensed for any indication that does not prevent transmission of, or infection from, the coronavirus is truly arbitrary and shocks the conscience and offends the community's sense of fair play and decency. This is especially true in light of Plaintiffs' allegation that in addition to the subject COVID-19 drugs not being effective, they are also not safe, as they cause a significantly higher incidence of injuries, adverse reactions, and deaths than any prior vaccines that have been allowed to remain on the market, and, therefore, pose a significant health risk to recipients, who are, by definition, healthy when they receive the COVID- 19 drugs. (Doc 10, ¶ 71.)

**a. Investigational Drug**. Defendants' refusal to acknowledge the authority of the FDA or HHS Secretary to assign a drug its Investigational Drug classification and the legal requirement of Defendants to "conspicuously" "state this product has not been approved or licensed by FDA" is not a defense against Plaintiffs' claims under Count 4.

**b. PREP Act.** Defendants heavily rely on the *Curtis* case, which is currently on appeal to the Ninth Circuit, citing to *Maney v. Brown*, for Defendants' contention that Plaintiffs cannot enforce

**OPPOSITION TO MOTION TO DISMISS**

rights under the PREP Act, but *Maney v. Brown* does not support Defendants' argument because even the *Maney* court stated, "the only issue presented in this appeal is whether the PREP Act bars Plaintiffs' vaccine prioritization damages claim against [government defendants]." (Doc 17, p. 9.) *Maney* involved prisoners who WANTED the shots but were placed behind correctional officers in a vaccine prioritization scheme. The Ninth Circuit held that the "vaccine prioritization scheme" was immunized under the PREP Act. No such issue is present in the case at bar because Plaintiffs did not want and never received the shots. Therefore, there was no "administration to or use by" Plaintiffs. And for the *Curtis* court and Defendants to state that the PREP Act precludes constitutional claims under 1983 is preposterous. An Act of Congress cannot and does not override the Constitution.

### c. Unwanted Investigational Drugs and Unwanted Medical Treatments

The gravamen of the case is Plaintiffs' fundamental right to refuse unwanted investigational drugs and unwanted medical treatments. Although Defendants cite numerous cases (Doc. 17, p. 10), they do not cite a single case relating to unwanted investigational drugs or unwanted medical treatments.

The Supreme Court has spoken with unambiguous clarity that "[n]o right is held more sacred or is more carefully guarded by the common law than the right of every individual to the possession and control of his own person, free from all restraint or interference of others unless by clear and unquestionable authority of law." *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250 (1891). In *Cruzan, supra*, the Supreme Court also held that "the right to self-determination ordinarily outweighs any countervailing state interests, and competent persons generally are permitted to refuse medical treatment, even at the risk of death. Most of the cases that have held otherwise, unless they involved the interest in protecting innocent third parties, have concerned the patient's competency to make a rational and considered choice." The Court clarified in *Washington v. Glucksberg*, 521 U.S. 702 (1997), that "The right assumed in *Cruzan*, however, was not simply deduced from abstract concepts of personal autonomy. Given the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment, our assumption was entirely consistent

SCHEXNAYDRE
LAW FIRM
2895 Hwy 190
SUITE 212
MANDEVILLE, LA 70471

with this Nation's history and constitutional traditions." Additionally, the Court stated in *Albright v. Oliver*, 510 U.S. 266, 272 (1994), that "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." When the U.S. Government mandated that Department of Defense civilians and service members inject investigational Anthrax drugs into their bodies, the DC Circuit Court enjoined that requirement, stating, "The Court is persuaded that the right to bodily integrity and the importance of complying with legal requirements, even in the face of requirements that may potentially be inconvenient or burdensome, are among the highest public policy concerns one could articulate." *Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004). Finally, as noted recently by the Supreme Court, "even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 208, L.Ed.2d 206 (2020).

### d. Fundamental Rights

Because Plaintiffs invoke a fundamental right, investigational drug mandates must be considered under strict scrutiny review. Defendants must show a compelling state interest to violate Plaintiffs' fundamental rights. Even with Defendants' purported desire "to reduce the spread of COVID-19 in our community" and to "slow the spread of COVID-19" and even admitting that it was relying on the World Health Organization's declaration of a global pandemic to require "dramatic interventions to disrupt the spread of this disease" (Doc 10-1, the Order, p. 1), these investigational drugs do not accomplish those goals because as Plaintiffs have alleged, these investigational drugs are not vaccines and they do not prevent transmission or infection. The goal of "reducing serious disease and hospitalizations," while admirable, does not rise to the level of allowing a governmental entity or individual to deprive Plaintiffs of their fundamental rights to bodily integrity and autonomy and to refuse unwanted investigational drugs and unwanted medical treatments.

In *Health Freedom v. Carvalho, supra,* the concurring opinion reminded us of what the Supreme Court has repeatedly held: "[The] Court has cautioned time and again that public employers may not

SCHEXNAYDRE
LAW FIRM
2895 Hwy 190
Suite 212
Mandeville, LA 70471

-14-

**OPPOSITION TO MOTION TO DISMISS**

1   condition employment on the relinquishment of constitutional rights." *Id.*, at 25, citing *Lane v. Franks*,

2   573 U.S. 228, 236 (2014).  The Supreme Court has also long held that Defendants cannot "produce a

3   result which [it] could not command directly." *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33

4   L.Ed.2d 570 (1972), *citing Speiser v. Randall*, 357 U.S. 513 (1958). "For at least a quarter-century, this

5   Court has made clear that even though a person has no 'right' to a valuable governmental benefit and

6   even though the government may deny him the benefit for any number of reasons, there are some

7   reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that

8   infringes his constitutionally protected interests." *Id*.

9

10      **e. *Smith v. Biden***

11      Citations to *Smith v. Biden* should be given no weight because that case relies upon Supreme

12   Court decisions that were decided in 2020, before the CDC admitted that these shots do not prevent

13   transmission or infection and, thus, are not vaccines, before the CDC changed the definition of

14   "vaccine," and before the historical numbers of adverse events were being reported to VAERS for these

15   COVID shots. (Doc 17, p. 10.) Defendants claim that its Order is somehow acceptable because it

16   emphasizes "the efficacy of the vaccines." (Doc 17, p. 11) Making a statement that is inaccurate does

17   not cause Defendants' Order to become constitutional and enforceable just because they want the fact to

18   be true.

19

20      **f. Right to Privacy**

21      The Ninth Circuit has held, "The constitutionally protected privacy interest in avoiding

22   disclosure of personal matters clearly encompasses medical information and its confidentiality."

23   *Norman-Bloodsaw v. Lawrence Berkeley Lab*, 135 F.3d 1260, 1269 (9th Cir. 1998). Defendants assert

24   that one's "vaccination status" (which is more accurately stated as "status of being injected with an

25   investigational drug") is not "sensitive or intimate" enough. (Doc 17, p. 11.) Perhaps Defendants forget

26   that Plaintiffs' civil rights, fundamental rights, property interests, liberty interests, personal rights, and

27   more, were in jeopardy if they disclosed that they had NOT been injected with these investigational

28

SCHEXNAYDRE
LAW FIRM
2895 Hwy 190
Suite 212
Mandeville, LA 70471

-15-

**OPPOSITION TO MOTION TO DISMISS**

drugs, so Plaintiffs' privacy rights were most certainly infringed. To state that divulging one's lack of being injected did not result in "injury, embarrassment, or stigma" ignores the fact that those who refused the shots were constantly subjected to injury, embarrassment, stigma, harassment, ridicule, scorn, and financial penalties. Instead, Defendants believe it is constitutional to ask one's status of being injected with an investigational non-vaccine to further an unconstitutional Order implemented for "stemming the spread of COVID-19" when the non-vaccine doesn't even accomplish that goal. Plaintiffs' right to privacy about whether they had been injected with COVID-19 investigational drugs that do not prevent transmission or infection outweigh Defendants' desire "to stem the spread of the virus" since the injections do not "stem the spread of the virus." Thus, since both injected and non-injected would catch and spread the virus, receiving the shots was a personal decision to risk being injured by an ineffective COVID-19 drug versus contracting a disease that had a documented 99.95% survival rate. Defendants' need to access this information was not only low, it was non-existent because the injected and non-injected could both spread the virus. Therefore, obtaining Plaintiffs' medical status furthered no legitimate interest by the City.

## PROCEDURAL DUE PROCESS

Defendants state that Plaintiffs offered "conclusory" allegations under Count Three. However, Plaintiffs clearly alleged a property interest in the right to accept or refuse an unlicensed drug under the EUA Statute, EUA letters, the PREP Act, the CDC Program, the state's Federal Wide Assurance agreement, and the fact that the drug was classified by the FDA as investigational. Moreover, under Count Three, Plaintiffs claimed the benefit of accessing free medical counseling to learn of the drug's risks, benefits, and alternatives and of the right to accept or refuse without penalty or pressure under the federal program and applicable law and that Defendants deprived them of those property rights without a hearing, which was unconstitutional. Defendants are not constitutionally authorized to establish a prohibited act under 21 U.S.C. § 331 (refusal), nor assign a penalty to that act under 21 U.S.C. § 333,

SCHEXNAYDRE
LAW FIRM
2895 HWY 190
SUITE 212
MANDEVILLE, LA 70471

-16-
OPPOSITION TO MOTION TO DISMISS

nor remove the option to refuse from the EUA statute, which the Order did. These acts demonstrate Defendants' reckless disregard for Plaintiffs' constitutional rights.

The mayor cannot issue a health Order mandating persons to use a covered countermeasure (i.e., masking, testing) under the PREP Act because that mandate deprives the individuals of their Fourteenth Amendment rights to bring common-law causes of action for product liability, medical malpractice, fraud, and battery; to seek tort remedies for bodily harm caused by another member of society; and to be made whole for damages to their finances and emotional well-being. The loss of Fourteenth Amendment fundamental rights under the Act must result from voluntary forfeiture, and the mayor deprived Plaintiffs of their rights by not providing Plaintiffs with a procedure to air their objections to the Order.

## EQUAL PROTECTION

Applying the standard espoused by Defendants for equal protection analysis, i.e., a "class of one" equal protection claim requires plaintiffs to demonstrate that Defendants "(1) intentionally (2) treated them differently than other similarly situated groups, (3) without a rational basis," results in a conclusion that the Order was no accident, so COB acted intentionally. (Doc 17, p. 15.) All Plaintiffs were similarly situated to all other City employees when all City employees were told to decide whether to get the shot, but those who exercised their constitutional and federal statutory rights to refuse were treated differently than those who exercised their constitutional and federal statutory right to accept. Finally, Defendants had no rational basis to treat the two classes unequally because those who were injected could pass along the virus to others just like those who were not injected, resulting in no basis, rational or not, to accomplish a goal of "stemming the spread of the virus."

## UNCONSTITUTIONAL CONDITIONS DOCTRINE

Defendants' contention that the Order did not establish an Unconstitutional Condition is blatantly incorrect. (Doc 17, pp. 15-16) When Defendants demanded that Plaintiffs inject an unlicensed EUA/PREP Act investigational, ineffective, unsafe drug into their bodies as a condition of their public employment with the City, Defendants conditioned the enjoyment of that privilege upon the forfeiture of

SCHEXNAYDRE
LAW FIRM
2895 HWY 190
SUITE 212
MANDEVILLE, LA 70471

-17-
OPPOSITION TO MOTION TO DISMISS

the Constitutional rights of bodily autonomy, due process, privacy, and equal protection. That is the very

definition of an unconstitutional condition.

### *MONELL* LIABILITY

Defendants asserts that Plaintiffs have failed to adequately alleged any constitutional injury or

other deprivation of rights, without discussion. (Doc 17, p. 16.) Yet Plaintiffs repeatedly alleged the

deprivation of constitutional rights of bodily autonomy and bodily integrity and federal statutory rights

to refuse an EUA drug and to be educated about the voluntary nature of a PREP Act program, under

which these drugs fell. (Doc 10, *passim*.) The City, a municipality, deprived Plaintiffs of those rights

and thus is liable to Plaintiffs under *Monell*. Defendants cannot constitutionally mandate a person to

participate in the federally funded CDC Program, be injected with unlicensed EUA drugs, or use PREP

Act countermeasures, which it did through its official health Order. Plaintiffs may seek redress using §

1983 without the City being able to assert a qualified immunity defense.

### QUALIFIED IMMUNITY

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar

as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known.'" *Pearson v. Callahan*, 555 U.S. 223 (2009). As the Supreme Court explained,

> In the civil sphere, we have explained that qualified immunity seeks to ensure that
> defendants 'reasonably can anticipate when their conduct may give rise to
> liability…by attaching liability only if "[t]he contours of the right [violated are]
> sufficiently clear that a reasonable official would understand that what he is doing
> violates that right.[citation omitted] So conceived, the object of the "clearly
> established" immunity standard is not different from that of "fair warning" as it
> relates to law "made specific" for the purpose of validly applying [the criminal
> equivalent of § 1983]."[12]

The *Lanier* Court added,

> But general statements of the law are not inherently incapable of giving fair and
> clear warning, and in other instances a general constitutional rule already identified
> in the decisional law may apply with obvious clarity to the specific conduct in
> question, even though 'the very action in question has [not] previously been held

[12] *US v. Lanier*, 520 U.S. 259 (1997) citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)

SCHEXNAYDRE LAW FIRM 2895 HWY 190 SUITE 212 MANDEVILLE, LA 70471

unlawful. [citation omitted] As Judge Daughtrey noted in her dissenting opinion in this case, "[t]he easiest cases don't even arise. There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability."[13]

The Ninth Circuit explained the two-part analysis for determining whether qualified immunity is appropriate in a § 1983 case:

> First, examine whether a constitutional right has been violated on the facts alleged, and

> Second, if there was a violation, examine whether the Constitutional rights were clearly established.

> As to the second inquiry, the Supreme Court has held that "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."[14]

In the case at bar, the constitutional rights violated are the constitutional rights of liberty (bodily integrity and autonomy), property (public employment and statutory entitlements), due process (substantive and procedural), and equal protection, all of which were violated when Mr. Fleetwood issued an Order requiring Plaintiffs to inject federally owned investigational drugs into their bodies as a condition of working for the City. The Fourteenth Amendment rights owed to Plaintiffs by Mr. Fleetwood could not be deprived before notice was given and a meaningful opportunity to air their protests was provided. Rather, Mr. Fleetwood unilaterally terminated Plaintiffs solely because Plaintiffs exercised their fundamental right to refuse the investigational drugs. This conduct by Mr. Fleetwood shocks the conscience.

The Supreme Court also holds that Qualified immunity is "an immunity from suit rather than a mere defense to liability" because "the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to

---

[13] *Id.*

[14] *Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004)

**OPPOSITION TO MOTION TO DISMISS**

SCHEXNAYDRE
LAW FIRM
2895 Hwy 190
SUITE 212
MANDEVILLE, LA 70471

1    discovery." *Pearson v. Callahan*, 555 U.S. 223 (2009). Insubstantial claims only involve allegations that

2    are "essentially fictitious" and "obviously without merit." *Bailey v. Patterson*, 369 U.S. 31 (1962).

3        Plaintiffs allegations are not "insubstantial" nor "without merit" and therefore, at this stage of the

4    litigation, it is improper to grant qualified immunity to Mr. Fleetwood when Plaintiffs allege that he acted

5    outside the scope of his authority and had ministerial duties to perform which factors implicate he is not

6    entitled to qualified immunity under the Ninth Circuit Court of Appeals and Supreme Court doctrines.

7        The Ninth Circuit examines the challenged conduct to determine whether it is discretionary or

8    ministerial. "[M]inisterial acts are unshielded by qualified immunity, which protects 'only actions taken

9    pursuant to discretionary functions'" *Groten v. California*, 251 F.3d 844 (9th Cir. 2001) In *Groten*, clerks

10   in the California Office of Real Estate Appraisers refused to give Mr. Groten an application for a

11   temporary real estate license. The clerks were denied qualified immunity because the act of providing an

12   application requires no discretion and was thus ministerial, leading to the Court to deny the defendants'

13   12(b)(6) Motion to Dismiss.

14

15       The Ninth Circuit reiterated its position in *Rieman v. Vazquez*, 96 F.4th 1085 (9th Cir. 2024)

16   holding that two social workers were not entitled to absolute or qualified immunity because the challenged

17   conduct only involved the ministerial function of providing notice of a hearing, which the defendants

18   breached. *See also, Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (denying absolute immunity

19   for conduct taken outside the prosecutor's scope of authority); *Frudden v. Pilling*, 877 F.3d 821 (9th Cir.

20   2017)(denying qualified immunity because defendants had discretionary authority to issue a policy but

21   lacked authority to apply the policy to the deprivation of the plaintiffs' Fourteenth Amendment rights.)

22

23       Therefore, if the challenged conduct falls outside Mr. Fleetwood's discretionary authority or only

24   involves a ministerial duty, he is "unshielded" from qualified immunity. Plaintiffs have alleged facts that

25   Mr. Fleetwood acted outside the scope of his authority (by issuing the Order relying upon investigational

26   drugs for compliance) and that he failed to exercise his ministerial duty to obtain Plaintiffs 'legally

27

28   effective informed consent (i.e., simply accepting Plaintiffs' decision to refuse).  Moreover, Plaintiffs

-20-

SCHEXNAYDRE
LAW FIRM
2895 Hwy 190
SUITE 212
MANDEVILLE, LA 70471

**OPPOSITION TO MOTION TO DISMISS**

1   have alleged that Mr. Fleetwood engaged in misbranding (Doc. 10, ¶83), which clearly establishes that
2   his conduct was unlawful and that unwanted medical treatment is a clearly established right which facts
3   require discovery and an opportunity for both parties to prove at trial.

4                                              **STATE LAW CLAIMS**

5           Defendants cited to *Dicomes v. State*, which provides that discharging Plaintiffs for "exercising
6   legal rights or privileges" contravenes public policy. Defendants accurately described Plaintiffs'
7   allegations as "they were discharged for exercising the legal right or privilege to refuse to take an
8   investigational drug or undergo unwanted medical treatment," however, COB responds by summarily
9   asserting that "the COVID-19 vaccine qualifies as neither an investigational drug nor as a medical
10  treatment." COVID (Doc 17, p. 18.) However, upon this court accepting Plaintiffs' allegations as true
11  that these drugs are both investigational drugs and an unwanted medical treatment, as it must on a
12  Motion to Dismiss, the termination of Plaintiffs for exercising these rights constitutes wrongful
13
14  termination under Washington law.

15          Defendants' Footnote 11 is both circular and misses the point. The focus is not on what
16  "motivated" Defendants to terminate Plaintiffs. The focus is on the right exercised by Plaintiffs.
17
18  Incidentally, Footnote 11 admits that there was no due process because it was a foregone conclusion that
19  refusers would be fired when Defendants assert that "the Order established that the consequence of
20  declining the COVID-19 vaccine would be separation from employment." (Doc 17, p. 18.) Exactly.
21  With no due process at all, Plaintiffs refused and were terminated. Period. End of story.

22                   **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)**
23
24          COB cites to a slew of non-binding district court cases arguing against IIED. (Doc 17, p. 19.)
25  But Plaintiffs stand by their allegations that "Defendants engaged in a scorched-earth policy and
26  inflicted, with malicious intent, emotional distress to the fullest extent that one in their positions of
27  authority and power could inflict, all to the detriment of Plaintiffs' emotional well-being." (Doc 10, ¶
28  296.) Plaintiffs adamantly assert that holding Plaintiffs' public employment over their head by

SCHEXNAYDRE
LAW FIRM
2895 Hwy 190
SUITE 212
MANDEVILLE, LA 70471

-21-

**OPPOSITION TO MOTION TO DISMISS**

1  effectively telling long-term public servants that they and their families will suffer financially if

2  Plaintiffs refused to be injected with EUA/PREP Act investigational drugs and unwanted medical

3  treatments that do not achieve the purported goal of "stemming the spread of the virus," and that are

4  causing historic levels of injuries is most definitely an action "'beyond all possible bounds of decency'

5  considering the circumstances at the time." The use of the phrase "considering the circumstances at the

6  time" implies that it is acceptable to treat Plaintiffs this way during an "emergency," but Congress

7  already considered it would be an "emergency" when it passed a law entitled "Emergency Use

8  Authorization Statute." The very statute in question requires an emergency to exist for the drugs to be

9  authorized. So, Defendants cannot rely upon the fact that there is an "emergency" in order to ignore the

10  rights conferred upon Plaintiffs regarding the use of Emergency Use Authorization drugs.

11

12                                              **CONCLUSION**

13          For the above reasons, Plaintiffs urge the court to deny Defendants' Motion to Dismiss.

14

15                                                              Respectfully submitted,

16          **CERTIFICATE OF SERVICE**
                    I hereby certify that on this 9th day       **SCHEXNAYDRE LAW FIRM**
17          of September, 2024, I presented the
            foregoing pleading to the Clerk of Court for
18          filing and uploading to the CM/ECF              BY:   /s/ David J. Schexnaydre
            system, which will send notification of        DAVID J. SCHEXNAYDRE, T.A.
19          such filing to all counsel of record.          Louisiana Bar Roll #: 21073
                                                            2895 Highway 190 • Suite 212
20                  /s/ David J. Schexnaydre               Mandeville, Louisiana 70471
                    DAVID J. SCHEXNAYDRE                    Telephone: (985) 292-2020
21                                                          Fax: (985) 235-1089
                                                            Email: david@schexnaydre.com
22                                                          Lead Counsel for Plaintiffs-*Pro Hac Vice*

23                                                          And

24                                                          */s/ Charice Holtsclaw*
                                                            CHARICE HOLTSCLAW, ESQ.
25                                                          WSBA# 53850
                                                            301 Prospect St.
26                                                          Bellingham, WA 98225
                                                            Phone: (816) 842-6700
27                                                          Email: holtsclaw.law@gmail.com
28                                                          Local Counsel for Plaintiffs

**OPPOSITION TO MOTION TO DISMISS**