UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

SEATTLE DIVISION

| | | |
|---|---|---|
| MICHAEL BROCK, *et al,* | * | |
| | * | |
| *Plaintiffs,* | * | |
| | * | |
| VERSUS | * | CIVIL ACTION 2:24-CV-850-BJR |
| | * | |
| CITY OF BELLINGHAM AND | * | |
| MAYOR SETH FLEETWOOD | * | |
| *Defendants,* | * | |

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *

**[PROPOSED] SECOND AMENDED COMPLAINT**
**(JURY TRIAL REQUESTED)**

NOW INTO COURT, through undersigned counsel, come Plaintiffs, Michael Brock, *et al*, (hereinafter "Plaintiffs"), who respectfully file this Second Amended Complaint against Defendants, the City of Bellingham and its final PolicyMaker, Mayor Seth Fleetwood (hereinafter "Defendants"), presenting allegations and causes of action **only to add** Galina D'Amelio, Joel Douglas, Brennan Jacoby, Jeremiah Leland, David Little, Neal Lunde, and Rebekah Rovey as plaintiffs as follows:

> Deleted: Elisabeth Oakes

> Deleted: a

## I   INTRODUCTION

1.   This cause of action arises out of the implementation of "City of Bellingham Executive Order 2021-02, COVID-19 Vaccinations for City of Bellingham Employees, Volunteers, and On-Site Indoor Contractor" adopted, executed, and enforced by the City of Bellingham, WA, and its final PolicyMaker, Mayor Seth Fleetwood.[1]

---

[1] Exhibit A, Executive Order ("Policy")

2.      When Plaintiffs exercised their fundamental rights to refuse an investigational drug and to refuse unwanted medical treatment and, thus, refused to comply with the Order, they were terminated from employment, resulting in financial, emotional, and legal injuries.

3.      Among the Plaintiffs, the first to be fired were firemen and mechanics who worked on fire trucks on October 18, 2021, followed by the remainder of Plaintiffs on December 3, 2021, or later.

4.      This cause of action is for monetary damages brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of Plaintiffs' clearly established right to refuse Emergency Use Authorization (EUA)/PREP Act investigational drugs and to refuse unwanted medical treatment without penalty or pressure against (1) Seth Fleetwood, in his capacity as Mayor and final PolicyMaker of the City of Bellingham, WA, for his violation of Plaintiffs' statutory and constitutional right to refuse an investigational drug or device authorized under the EUA Statute (21 U.S.C. §360bbb-3) and/or under the PREP Act, without penalty or pressure; and (2) the City of Bellingham ("Bellingham" or "City") for its unconstitutional policies, customs, and/or practices under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978) and its progeny, and for breach of contract, and wrongful termination relating to Plaintiffs exercising a protected constitutional and legal right. The City of Bellingham and Seth Fleetwood will be referenced collectively as Defendants ("Defendants") herein.

## II.      JURISDICTION AND VENUE

5.      This Court has federal-question jurisdiction under 42 U.S.C. §1983 for violations of civil rights under the Fourteenth Amendment to the United States Constitution.

6.      The case presents a federal question within the Court's jurisdiction under Article III, § 2 of the United States Constitution and 28 U.S.C. §§ 1131 and 1343.

[PROPOSED] SECOND AMENDED COMPLAINT                                    2

7.      Venue is proper in this Court under 28 U.S.C. § 1391 because at all times material, the parties resided in this District, and a substantial part of the events giving rise to this claim occurred in this District.

8.      This Court has the authority and jurisdiction to award costs and reasonable attorney's fees under 42 U.S.C. § 1988.

9.      This court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. 1367.

10.     This Court has personal jurisdiction over Defendants as they are, or at the time of their actions were, domiciled within this Court's jurisdictional boundaries.

11.     This Court has subject matter jurisdiction over the parties because all acts complained of herein were committed by Defendants in the State of Washington ("Washington") and caused damage and/or deprivation to the Plaintiffs listed herein.

### III.    PLAINTIFFS

12.     The following individuals are plaintiffs herein:

1.  Plaintiff, Matthew Leroy Allbaugh, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

2.  Plaintiff, Craig Brewer, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

3.  Plaintiff, Michael Brock, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

4.  Plaintiff, Kelly Gambini, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

5.  Plaintiff, Robert Vincent Glorioso, is an adult individual who, at all times material,

was a Washington resident employed by the City of Bellingham, WA.

6. Plaintiff, Jason Hagin, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

7. Plaintiff, Daniel Larsen, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

8. Plaintiff, Brian Long, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

9. Plaintiff, Shawn Curtis Manthey, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

10. Plaintiff, Paul Pluschakov, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

11. Plaintiff, Caleb Rodriguez, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

12. Plaintiff, Hannah Snavely, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

13. Plaintiff, Angela Terry, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

14. Plaintiff, Dion Terry, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

15. Plaintiff, Tawsha Kathleen Thompson, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

16. Plaintiff, William Travis Trueman, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

[PROPOSED] SECOND AMENDED COMPLAINT                                    4

17. Plaintiff, Timothy Van Dyke, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

18. Plaintiff, Tim VanderMey, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

19. Plaintiff, Elisabeth Oakes, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

20. Plaintiff, Galina D'Amelio, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

21. Plaintiff, Joel Douglas, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

22. Plaintiff, Brennan Jacoby, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

23. Plaintiff, Jeremiah Leland, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

24. Plaintiff, David Little, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

25. Plaintiff, Neal Lunde, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

26. Plaintiff, Rebekah Royev, is an adult individual who, at all times material, was a Washington resident employed by the City of Bellingham, WA.

## IV.   DEFENDANTS

13.   The following are named as defendants herein:

1.   Defendant, the City of Bellingham ("City" or "City of Bellingham"), is a City

located and incorporated in the State of Washington.

    2.     Defendant Seth Fleetwood was the Mayor of the City of Bellingham, WA, at all material times. Mr. Fleetwood is named as a defendant in his individual and official capacities.

<strong>V.    <u>FACTUAL BACKGROUND</u></strong>

    14.    In 2020, the federal government purchased and introduced into commerce COVID-19 drugs that were only authorized for emergency use under 21 U.S.C. §360bbb-3 ("EUA Statute"), FDA-labeled as investigational and listed as covered countermeasures under 42 U.S.C. § 247d-6d and 42 U.S.C. § 247d-6e ("PREP Act").

    15.    All available COVID-19 drugs under the CDC Program (see *infra*) were investigational and funded by the Department of Defense ("DoD").

Deleted: ¶

16.     This meant the federal government was obligated to comply with 45 C.F.R. Part 46,[2] the Belmont Report,[3] Federal Wide Assurance ("FWA"),[4] 10 U.S.C. § 980,[5] the EUA Statute, and the PREP Act.

17.     The primary ministerial duty required of the federal government when offering humans federally funded investigational drugs is to ensure it _prospectively_ obtains the individual's "legally effective informed consent."

18.     Legally effective informed consent means that the potential recipient is provided the information required to make a quality informed decision,[6] ensuring they are not waiving rights they possess[7] and informed of the risks/benefits/alternatives[8] of the product/procedure and of their right to accept or refuse without penalty or pressure.[9]

---

[2] Congress enacted The National Research Act ("NRA") in 1974 to prevent medical research abuses by the executive branch, military, and persons acting on behalf of the federal government. The NRA required the Secretary to promulgate 45 C.F.R. Part 46 to protect persons involved with investigational new drugs under research conditions. "Research" under the legal framework is not a clinical trial but an activity "designed to develop or contribute to generalizable knowledge" about the product, theory, process, etc. As an example, college students studying medical charts is "research" or the EUA Statute requiring the "manufacturer," "emergency response stakeholder," and "vaccination provider" to "monitor" and "report" adverse events of the drugs 'involvement with a human is research because the requirement is "designed to develop or contribute to generalizable knowledge." The Belmont Report, required by the NRA, established the principles of informed consent and is required adherence under 45 C.F.R. Part 46 (§§ 101(c),(i)) as a duty owed to potential participants.

[3] 45 CFR § 46.101(c) and 45 CFR § 46.101(i) require any federally funded research activity to be subject to the Belmont Report. The National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research.– Belmont Report. Washington, DC: U.S. Department of Health and Human Services. 1979. See Part C "voluntariness."

[4] The federal government established the FWA to ensure it complied with its lawful obligations to protect humans who are offered investigational drugs. The FWA requires persons participating in federally funded research products and activities to assure the federal government that it will comply in whole with 45 C.F.R. Part 46 and specifically the Belmont Report. The federal government issuing a FWA number to an organization means the organization provided a written assurance to HHS that it would comply with the regulatory framework when subjected in federally funded research activities such as the CDC COVID-19 Vaccination Program. FWA HHS Site:
https://www.hhs.gov/ohrp/register-irbs-and-obtain-fwas/fwas/fwa-protection-of-human-subject/index.html

[5] "Funds appropriated to the Department of Defense may not be used for research involving a human being as an experimental subject unless—(1) the informed consent of the subject is obtained in advance" 10 U.S.C. § 980. The research project does not need to include members of the military, only that DoD funding is utilized in the activity involving a human by any person, DoD or otherwise.

[6] 45 C.F.R. § 46.116(a)(4)

[7] 45 C.F.R. § 46.116(a)(6)

[8] 45 C.F.R. §§ 46.116(b)(2),(3),(4)

[9] 45 C.F.R. § 46.116(b)(8)

[PROPOSED] SECOND AMENDED COMPLAINT                                                    7

19.     These basic elements of legally effective informed consent ensure the individual is not under "coercion," "unjustifiable pressures," "undue influence," or "sanctions" when offered the federally funded investigational drugs.

20.     If informed consent is obtained prospectively under conditions free from outside pressure, then it is deemed to be "legally effective."

21.     If individuals are under outside pressure to be injected with an investigational drug and consent due to that unlawful pressure, legally effective informed consent is not obtained.

22.     If individuals are threatened with a penalty for refusing to be injected with an investigational drug, the ability to give legally effective informed consent has been vitiated.

23.     If individuals are penalized for refusing to be injected with an investigational drug, then they are deprived of their legally effective informed consent rights even though they refused the product.

24.     Legally effective informed consent is a legal mechanism that must be obtained before an investigational drug is administered.

25.     21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) ("the option to accept or refuse") was derived from the Belmont Report and 45 C.F.R. § 46.116.

26.     To comply with its informed consent obligations regarding its EUA/PREP Act investigational drugs, the federal government created the CDC COVID-19 Vaccination Program ("CDC Program").

27.     The CDC Program was designed to distribute the federally funded COVID-19 EUA/PREP Act drugs through states volunteering to use their health department's existing immunization program because each state has an FWA on file with the federal government requiring it to comply with the same federal laws to which the Executive branch is bound.

[PROPOSED] SECOND AMENDED COMPLAINT                                    8

28.     Washington has a Federal-Wide Assurance agreement (FWA00000326) with the federal government, requiring it to comply with the same laws, regulations, and treaties as the U.S. Executive branch under the CDC Program.

29.     The FWA means Washington has submitted all required documentation to constitute a commitment to comply with the requirements of 45 CFR Part 46 when its employees or agents engage in non-exempt human subjects research conducted or supported by HHS or other research covered by the assurance.[10]

30.     In late 2020, the CDC recruited Washington to help it administer the federally funded COVID-19 EUA/PREP Act drugs.

31.     The CDC issued guidance to Washington known as the "COVID-19 Vaccination Program Interim Operational Guidance Jurisdiction Operations" playbook ("Playbook").[11]

32.     Washington willfully participated in the CDC Program under its prerogative, agreeing to its terms and conditions.

33.     The federal government could not delegate the function of administering the federally funded investigational products without delegating its constitutional, statutory, and contractual obligations to the state.

34.     Washington, agreeing to perform on behalf of the federal government, owed Fourteenth Amendment obligations to potential EUA/PREP Act investigational drugs recipients.

35.     Washington had a duty to "closely monitor activities at the local level to ensure the COVID-19 Vaccination Program is implemented throughout the jurisdiction in adherence with

---

[10] https://www.hhs.gov/ohrp/register-irbs-and-obtain-fwas/fwas/index.html
[11] See Exhibit B, CDC Playbook

[PROPOSED] SECOND AMENDED COMPLAINT                                    9

federal guidance and requirements,"[12] including to "help the public to understand key differences in FDA emergency use authorization and FDA approval" (i.e., licensure).[13]

36.     The CDC Program created the "CDC COVID-19 Vaccination Program Provider Agreement[14]" ("Provider Agreement") to be signed by persons and entities participating in the CDC Program to ensure the State and the State's recruited parties complied with their legal obligations.

37.     Washington adopted the Provider Agreement as official State policy when recruiting entities to agree to its terms and sign it as a condition of performing for the State under the CDC Program.

38.     Line 12(a) of the Provider Agreement requires strict adherence to the requirement of the EUA Statute and "any EUA letter" to inform individuals of their right to accept or refuse any product authorized under the statute. (See 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III)). [15]

39.     Line 12(b) requires the person offering the product to comply with all applicable state and territorial laws regulating vaccine administration.

40.     At all times material, the federal government restricted Washington and its political subdivisions from issuing a mandate requiring individuals to be injected with the federally funded COVID-19 investigational drugs.

41.     Additionally, Washington did not authorize a mayor or city to act outside the State's constitutional, statutory, or contractual obligations under the CDC Program.

---

[12] See Exhibit B, CDC Playbook, p. 8
[13] See Exhibit B, CDC Playbook, p. 42
[14] See Exhibit C, CDC Provider Agreement
[15] 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III)

42.     Mayor Fleetwood and the City of Bellingham only had discretionary authority to inform the city's residents about the federal program, where, when, and how Plaintiffs could obtain the available drugs, and of their risks/benefits/alternatives.

43.     Mayor Fleetwood and the City of Bellingham had a ministerial duty of accepting Plaintiffs' choice of whether they did or did not want to be injected with EUA/PREP Act investigational drugs.

44.     Washington, Mr. Fleetwood, and the City of Bellingham owed Fourteenth Amendment obligations to Plaintiffs, ensuring their Equal Protection, Due Process, and Privacy rights were protected at all times material anytime they involved Plaintiffs with the federally funded investigational drugs or program activities.

## VI.     FACTUAL ALLEGATIONS

**A.     Deprivation of Plaintiffs' Rights**

45.     At all times material, Plaintiffs were public employees of the City of Bellingham.

46.     At all times material, Defendant Seth Fleetwood was the Mayor of Bellingham.

47.     At all times material, Mr. Fleetwood and the City of Bellingham owed Fourteenth Amendment obligations to Plaintiffs when subjecting them to federally funded COVID-19 EUA/PREP Act investigational drugs immunized from liability under the PREP Act or drugs authorized under the EUA Statute in general.

48.     After offering City employees the EUA/PREP Act investigational drugs, Defendants only had a ministerial duty to accept the chosen option under the EUA Statute without penalty or pressure.

49.     To the contrary, however, under threat of penalty, Mr. Fleetwood and the City of Bellingham issued an official policy requiring Plaintiffs to involuntarily submit to the injection of

[PROPOSED] SECOND AMENDED COMPLAINT                                          11

the (1) Pfizer-BioNTech COVID-19 Vaccine drug,[16] (2) Moderna COVID-19 Vaccine drug,[17] or the (3) Janssen COVID-19 Vaccine drug,[18] as a condition of public employment even though the HHS Secretary informed Defendants that those drugs were "an investigational vaccine not licensed for any indication."[19]

50. Moreover, the drugs were only authorized fo emergency use under the EUA Statute, listed as countermeasures under the PREP Act, and FDA-labeled as investigational, without a legal indication to treat, cure, or prevent any known disease.

51. Additionally, the drugs were not licensed for safety and efficacy and were subject to the terms and conditions of the State-run CDC Program.

**B.     The Executive Order**

52. On or about September 21, 2021, Mayor Fleetwood, using the powers of his office, issued Executive Order 2021-02 ("Policy")[20] to "establish a mandatory vaccination policy, effective immediately," requiring all "City employees" and "On-Site Indoor Contractor[s]" "to be fully vaccinated against COVID-19 virus as a condition of employment no later than December 3, 2021."

53. The Policy asserted that on March 10, 2020, Whatcom County "declared a Whatcom County public health emergency to reduce the spread of COVID-19 in our community." (Exhibit A, Executive Order, Second Whereas Paragraph)

54. The Policy asserted "the Whatcom County Health Officer issued recommendations to slow the spread of COVID-19." (Exhibit A, Executive Order, Fourth Whereas Paragraph)

---

[16] 86 Fed.Reg. 5200, Jan. 19, 2021
[17] 86 Fed.Reg. 5200, Jan. 19, 2021
[18] 86 Fed.Reg. 28608, May 27, 2021
[19] Exhibit D, 12/11/2020 EUA Letter
[20] Exhibit A, Executive Order, The Policy

[PROPOSED] SECOND AMENDED COMPLAINT                                                    12

55.     The Policy asserted that "the WHO has raised the health emergency to the highest level requiring dramatic interventions to disrupt the spread of this disease." (Exhibit A, Executive Order, Seventh Whereas Paragraph.)

56.     Despite the backdrop of needing to "disrupt the spread of this disease," Mayor Fleetwood's Policy admits that there have been "breakthrough infections in some fully vaccinated individuals." (Exhibit A, Executive Order, Ninth Whereas Paragraph.)

57.     The Policy only claims, however, that "COVID-19 vaccines are effective in reducing serious disease and hospitalizations." (Exhibit A, Executive Order, Tenth Whereas Paragraph.)

58.     Incongruously, the Policy asserts, "widespread vaccination is the primary means available to the City to protect its employees and the public, including persons who cannot be vaccinated for medical reasons, youth who are not eligible to receive a vaccine, immunocompromised individuals, and vulnerable persons," implying that somehow by certain individuals being injected with the COVID-19 shots, which allegedly "are effective in reducing serious disease and hospitalizations" in the person being injected, it could protect "persons who cannot be vaccinated for medical reasons, youth who are not eligible to receive a vaccine, immunocompromised individuals, and vulnerable persons." (Exhibit A, Executive Order, Eleventh Whereas Paragraph.)

59.     Read as a whole, the Policy implies that the COVID-19 drugs available to Plaintiffs were necessary to prevent the spread of COVID-19 to vulnerable populations.

60.     However, at all times material, the COVID-19 drugs available to Plaintiffs were neither safe nor effective.

[PROPOSED] SECOND AMENDED COMPLAINT                                                          13

61.     At all times materials, the COVID-19 drugs available to Plaintiffs did not prevent transmission or infection from the COVID-19 virus, including the Delta and Omicron variants.

62.     On August 5, 2021, CDC Director Rochelle Walensky admitted that the COVID-19 drugs did not prevent transmission or infection, but rather allegedly lessened the severity of the disease once contracted.

63.     The CDC's assertion that the COVID-19 drugs prevented hospitalization and death is inaccurate and untrue.

64.     Moreover, on September 1, 2021, the CDC actually changed the definition of "vaccine" because the available COVID-19 drugs did not meet the former definition of "vaccine," which was: A product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease.

65.     The new definition was bureaucratically created after the subject COVID-19 injections received an Emergency Use Authorization, were manufactured, shipped, and administered to millions of individuals and, thus, the new definition is a substantive change and can be applied only prospectively, not retroactively.

66.     The new definition of "vaccine" cannot apply to the subject COVID-19 drugs because the new definition cannot be applied retroactively and thus these drugs do not meet the applicable and traditional definition of "vaccine."

67.     Moreover, because the subject COVID-19 drugs do not prevent transmission or provide immunity from infection, they are not vaccines.

[PROPOSED] SECOND AMENDED COMPLAINT                                          14

68.    Since the subject COVID-19 drugs, at best, only mitigate symptoms for someone who contracts COVID-19, they are medical treatments.

69.    Plaintiffs have a fundamental right and constitutionally protected liberty interest to refuse unwanted medical treatment. *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 278-79 (1990); *Washington v. Glucksberg*, 521 U.S. 702 (1997).

70.    Because the subject COVID-19 drugs do not prevent transmission or infection, and thus there is no immunity against the disease, there is no public health basis for mandating that individuals be injected with these EUA/PREP Act investigational drugs.

71.    In addition to the subject COVID-19 drugs not being effective, they are also not safe, as they cause a significantly higher incidence of injuries, adverse reactions, and deaths than any prior vaccines that have been allowed to remain on the market, and, therefore, pose a significant health risk to recipients, who are, by definition, healthy when they receive the COVID-19 drugs.

72.    Since, according to the CDC, the COVID drugs do not prevent the infection or transmission of COVID, while at the same time, also according to the CDC, they result in a massively anomalous (1000% higher) number of adverse events and deaths, there is no justification in the law for mandating them, and the City of Bellingham's Policy was unlawful and deprived Plaintiffs of their constitutional and federal statutory rights.

73.    Because Plaintiffs have a fundamental right to refuse investigational drugs without penalty or pressure and because Plaintiffs have a fundamental right to refuse unwanted medical treatment, the court must analyze the City of Bellingham's Policy using a compelling state interest standard.

[PROPOSED] SECOND AMENDED COMPLAINT                                             15

74.     The City of Bellingham does not have a compelling state interest (or even a rational basis) for mandating COVID-19 drugs that are neither safe nor effective.

75.     At all times material, Defendants did not procure any FDA-licensed vaccines, nor instruct Plaintiffs of where, when, and how to obtain FDA-licensed vaccines that were not subject to the EUA Statute or under the PREP Act to comply with the Policy.

76.     Therefore, Defendants subjected Plaintiffs, under threat of penalty, to the federally owned COVID-19 EUA drugs immunized under the PREP Act in violation of Plaintiffs' constitutional protections and statutory entitlements.

77.     Although COMIRNATY® was licensed for general commercial marketing on August 23, 2021, Pfizer informed the CDC that it did not, nor would it, manufacture its licensed version; rather, it would continue to use its investigational version under the federal CDC Program.

78.     The Policy, relying exclusively on the use of the federally owned COVID-19 EUA/PREP Act investigational drugs, was unconstitutional, unlawful, arbitrary, and capricious because it applied penalties to any person refusing their administration.

79.     Defendants were expressly prohibited by Congress,[21],[22] the federal government's executive branch,[23] the HHS Secretary,[24] the CDC,[25] Washington State common law, and the Fourteenth Amendment[26] from establishing a public employment policy on the condition of an individual being injected with an EUA investigational new drug funded by the federal government and listed as a countermeasure under the PREP Act.

---

[21] The State's FWA, 10 U.S.C. § 980, 45 C.F.R. § 46.116, and the Belmont Report.
[22] The PREP Act requires only voluntary participation.
[23] CDC Program
[24] Each EUA requires only voluntary conditions.
[25] CDC COVID-19 Vaccination Program Provider Agreement
[26] The products must be administered equally under 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III), and in accordance with Plaintiffs' privacy and due process rights.

[PROPOSED] SECOND AMENDED COMPLAINT                                              16

80.     Mr. Fleetwood and the City of Bellingham established the official Policy, required City managers to enforce the Policy, and acted upon the Policy thereby violating Plaintiffs' constitutional and statutory rights, meaning the Mayor and City are persons who "subject another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978) citing *Sims v. Adams* (5th Cir. 1976)

**C.    Drug Labeling Laws**

81.     Congress restricts drug manufacturers from introducing drugs not licensed for general commercial marketing into commerce according to the product's labeling (21 U.S.C. § 355(a)).

82.     A drug is regulated according to its labeling as assigned by the FDA.

83.     A person commits a misbranding felony under 21 U.S.C. § 331 when presenting an unlicensed drug as if it is licensed with the intent (21 C.F.R. §201.128) of causing a person to use the drug under the false belief that the drug is something other than its FDA-authorized labeling.[27]

84.     The only drugs Defendants procured for Plaintiffs to comply with its Policy were investigational and thus governed by laws that require the use of those drugs only under voluntary conditions.

---

[27] "Under the provisions of the Food, Drug and Cosmetic Act, a company must specify the intended uses of a product in its new drug application to FDA. Once approved, the drug may not be marketed or promoted for so-called 'off-label 'uses – i.e., any use not specified in an application and approved by FDA. Pfizer promoted the sale of Bextra for several uses and dosages that the FDA specifically declined to approve due to safety concerns. The company will pay a criminal fine of $1.195 billion, the largest criminal fine ever imposed in the United States for any matter." - Justice Department Announces Largest Health Care Fraud Settlement in Its History. Justice.gov. Published September 2, 2009. Accessed November 12, 2023. https://www.justice.gov/opa/pr/justice-department-announces-largest-health-care-fraud-settlement-its-history

[PROPOSED] SECOND AMENDED COMPLAINT                                          17

85.     There are more than 19,000 licensed drugs in the marketplace, and thousands of those drugs have investigational versions sharing formulations.

86.     The investigational versions are only regulated according to their labeling, not by their formulations.

87.     The FDA informed Defendants that while Pfizer's COVID-19 drugs were medically interchangeable, they were "legally distinct."[28]

88.     The laws applicable to a licensed drug do not apply to drugs labeled as unlicensed and *vice versa*.

89.     The applicable laws are different because the labels are different.

90.     At all times material, Defendants knew the drugs were "an investigational vaccine not licensed for any indication."

91.     Defendants ignored that unambiguous language and, with willful, wanton, and reckless disregard for the Plaintiffs' rights, presented the drugs under the pretense that they were FDA-licensed with a legal indication to prevent the spread of the Coronavirus.

**D.      Mayor Seth Fleetwood**

92.     Mayor Seth Fleetwood, a City employee and the City's executive leader, had the authority to issue executive orders and promulgate regulations during a declared emergency, but only within Constitutional and statutory restraints.

93.     Bellingham Municipal Code 2.57.060 empowers the Mayor to "make and issue orders during a proclaimed local emergency," which the Mayor used to issue a Proclamation of Local Emergency on March 12, 2020.

---

[28] Exhibit E, 8/23/2021 EUA Letter, FN8

[PROPOSED] SECOND AMENDED COMPLAINT                                    18

94.     Mr. Fleetwood, in his Executive Order, proclaimed in unambiguous language that "I, Seth Fleetwood, at my sole discretion as chief administrator of the City of Bellingham, order the following…" denoting that Mr. Fleetwood was the final policymaker of the Executive Order.

      **i.**      **Unconstitutional Policy**

95.     Congress explicitly stated that only the HHS Secretary could authorize an unlicensed drug for emergency use under the EUA Statute. However, not even the Secretary can require any individual to use the drug or penalize anyone refusing to use it (21 U.S.C. §360bbb-3(l)).

96.     Mr. Fleetwood had no authority to establish "prohibited acts" (refusing an EUA drug) under 21 U.S.C. § 331 (FDCA), which his Policy did, nor was he authorized to define a penalty (i.e., segregation, discriminatory conditions, invasion of privacy, termination from employment, etc.) under 21 U.S.C. § 333, which his Policy did, for individuals refusing an EUA drug.

97.     Mr. Fleetwood was not authorized to void the option to refuse under the EUA Statute by penalizing those who refused, which his Policy did.

98.     Mr. Fleetwood established a Policy that treated public employees choosing the statutory entitlement option to accept differently than public employees choosing the option to refuse. He thereby violated Plaintiffs' rights to Equal Protection under the Fourteenth Amendment.

99.     Mr. Fleetwood established a Policy that deprived Plaintiffs of their expected and promised benefits (i.e., property interests) under the Provider Agreement, the EUA Statute, and the State's FWA to be informed of the "risks," "benefits," "alternatives" to the EUA drugs and the

right to accept[29] or refuse[30] without being placed under outside pressure to participate, incurring a fee, or penalty outside of Plaintiffs' procedural Due Process rights under the Fourteenth Amendment.

100.    Mr. Fleetwood was bound to ensure that all public employees were informed of their right to accept or refuse the federally funded COVID-19 EUA/PREP Act investigational drugs without penalty or pressure when he voluntarily inserted himself into the State's emergency program with the federal government by issuing his Policy.

101.    At all times material, Mr. Fleetwood concealed the Plaintiffs' right to refuse without loss of benefits to compel them to be injected with investigational drugs without their free consent.

102.    Mr. Fleetwood established a requirement that Plaintiffs prospectively surrender their Due Process rights under the Fourteenth Amendment (i.e., their ability to sue) should they incur injury from the use of a "covered countermeasure" under the PREP Act as a condition of continuing public employment, thereby violating Plaintiffs' substantive and procedural due process rights.[31]

103.    The Policy's requirement to use EUA products and participate in activities under the PREP Act for continuing public employment was an unconstitutional condition placed upon Plaintiffs.

104.    Mr. Fleetwood, without authority, amended the "conditions of authorization" under each EUA to require that which Congress prohibits—involuntary use of EUA drugs.

---

[29] The right to accept is a property interest because that right exempts the drug from 21 U.S.C. § 355(a) for Plaintiffs' benefit during a declared emergency.
[30] The right to refuse without paying a fee, incurring a penalty, or losing a benefit is a property interest held by Plaintiffs when considering participation in the product.
[31] The PREP Act immunizes "covered persons" from civil suits if someone is injured by the product or its administration.

105.    Mr. Fleetwood established an unlawful Policy requiring individuals to receive an investigational new drug, and/or use an EUA testing article or device as a condition of starting or continuing employment, thereby violating Plaintiffs' fundamental liberty interest to bodily integrity (see, *infra*).

106.    Mr. Fleetwood established a Policy requiring individuals to divulge their personal and private health information about whether they used an investigational drug, even though he was under a legal duty to perform only the ministerial function of accepting Plaintiffs' chosen option without adding additional requirements as a condition of him accepting Plaintiffs' option, thereby violating Plaintiffs' fundamental right to privacy.

107.    Mr. Fleetwood established a Policy requiring individuals to receive unwanted medical treatment, thereby violating Plaintiffs' fundamental right to refuse unwanted medical treatment.

108.    Mr. Fleetwood established a Policy requiring individuals to be injected with EUA/PREP Act investigational drugs or be penalized, thereby violating Plaintiffs' fundamental right to refuse investigational drugs.

**ii.      The Policy Was Unlawful**

109.    The Policy, relying exclusively on the use of EUA/PREP Act drugs that were neither safe nor effective, was unlawful.

110.    Congress granted Plaintiffs the exclusive right to accept or refuse an EUA/PREP Act drug, thus Defendants could apply coercive or penal measures to interfere in the choice.

111.     The Policy established that Plaintiffs could not exercise their Constitutional and federal statutory rights without being terminated from public employment in violation of well-established federal and Washington State common law.[32]

112.     Washington agreed to perform the ministerial function of accepting an individual-chosen option when subjecting them to EUA/PREP Act investigational drugs.

113.     Defendants did not have the authority to establish a Policy depriving Plaintiffs of public employment when exercising their option to refuse.

114.     One COVID-19 EUA drug has millions of potential adverse reactions interacting with 19,000 FDA-licensed drugs, hundreds of diseases, and their combinations, demonstrating why Congress provides the individual with the exclusive right to choose, not Defendants on the individual's behalf.

### iii.     The Policy Was Arbitrary and Capricious

115.     The PREP Act expressly preempted Mr. Fleetwood[33] from establishing a Policy that conflicted with the "voluntary"[34] nature of the PREP Act program and to any "requirement applicable to the covered countermeasure" under the FDCA, including the option to refuse under 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III).

116.     Mr. Fleetwood, under the Supremacy Clause, was preempted from establishing a Policy that amended the Conditions of Authorization for each EUA drug since the emergency

---

[32] *Becker v. Community Health Systems*, 184 Wn.2d 252, 359 P.3d 746 (2015); *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 358 P.3d 1159 (2015), and *Rickman v. Premera Blue Cross*, 184 Wn.2d 300, 358 P.3d 1153 (2015)

[33] During the effective period of a declaration under subsection (b)…no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that— (A) is different from, or is in conflict with, any requirement applicable under this section; and (B) relates to the…administration…of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section or any other provision of this chapter, or under the **Federal Food, Drug, and Cosmetic Act**." ("FDCA") (emphasis added). 42 U.S.C. § 247d-6d(a)(8)

[34] 42 U.S.C. § 247d-6e(c)

release of unlicensed drugs is a field completely dominated by the federal government, and the Policy conflicted with the federal goals of Congress involving its investigational drugs.

117.    Only the HHS Secretary has the authority to introduce into commerce drugs not licensed for the intended use under a declared emergency and only if there are no drugs licensed for the intended emergency use in commerce.[35]

118.    Yet, Congress specifically restricted the Secretary's authority, expressly stating that the Secretary does not have "any authority to require any person[36] to carry out any activity that becomes lawful pursuant to an authorization under this section."[37]

119.    Therefore, if the HHS Secretary is the only person authorized to establish conditions for the use of the EUA drug, and Congress restricts even the Secretary from requiring an individual from participating in any authorized activity, then Mr. Fleetwood can cite to nothing, giving him authority to establish a Policy requiring that which Congress prohibits (i.e., mandatory use) or to apply a consequence when a person refuses the product.

120.    Congress created a right for an individual to accept or refuse[38] an emergency use authorized product and concurrently restricted anyone from establishing a policy mandating the individual to use the product, and Defendants are not authorized to establish and impute a penalty to the Plaintiffs for refusing to be injected because the penalty does not reconcile with the statute's required voluntary condition.

---

[35] 21 U.S.C. §360bbb-3(C)(3)
[36] "[I]ndividual, partnership, corporation, and association" 21 U.S.C. § 321(e)
[37] 21 U.S.C. §360bbb-3(l)
[38] 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III)

[PROPOSED] SECOND AMENDED COMPLAINT                                          23

121.    Under those conditions, Mr. Fleetwood had a ministerial duty to accept Plaintiffs' chosen option without subjecting Plaintiffs to involuntary use, and was provided no discretionary authority to amend, add to, or delete from the statute, which his Policy did.

122.    Mr. Fleetwood's Policy was issued outside the scope of his authority, relying exclusively on the use of the State-run CDC Program using only the federally owned COVID-19 investigational drugs for compliance with the Policy.

123.    Plaintiffs include, but are not limited to, an EMS Captain, a Fleet Manager, a Senior Inspector, Firefighters, EMTs, Police Officers, a Level 3 Fleet Mechanic, and a Wastewater Collections Supervisor, among others.

124.    This wide variety of city roles demonstrates that Mr. Fleetwood was willing to risk burning the city down during a pandemic if and when personnel responsible for emergency responses exercised their legal right to refuse the injection of the federally owned investigational drugs.

125.    These acts do not demonstrate rational analysis, only a complete and reckless disregard for the federal Constitution, Plaintiffs' rights, and the needs of the City.

126.    Moreover, the Plaintiffs submitted religious and medical exemption requests, which were not even required since the Plaintiffs already had constitutional and federal rights to refuse.

127.    Defendants should have accepted those exemption requests, but Mr. Fleetwood's reckless actions denied religious and medical exemptions submitted by Plaintiffs, thereby endangering their personal safety and causing the damages recited herein.

128.    The COVID-19 manufacturers stated in unambiguous language that their drugs were investigational and that protection was unknown.

[PROPOSED] SECOND AMENDED COMPLAINT                    24

129.     Moreover, the manufacturers, in unambiguous language, informed Mr. Fleetwood and the City of Bellingham that their drugs came with serious side effects, including myocarditis and pericarditis, among dozens of others.

130.     Plaintiffs were otherwise healthy individuals who were not in danger of succumbing to death by the COVID-19 virus, and the investigational drugs had proven at the time of the Policy's issuance that they did not prevent infection or transmission of the virus.

131.     Therefore, the Policy was arbitrary and capricious because it required the use of investigational drugs that had no legal indication to prevent, treat, or cure any known disease and were under strict legal protocols requiring only voluntary participation.

132.     Moreover, Defendants can cite to no authority providing them authority to amend the conditions established by the HHS Secretary under each EUA, which the Policy did.

133.     The Policy was also unlawful because a government employer is constitutionally constrained from mandating the use of drugs that are neither safe nor effective.

134.     The Policy was also unlawful because a government employer is constitutionally constrained from mandating a medical treatment.

> **iv.     The Policy Was a Reckless, Willful, and Wanton Disregard for Plaintiffs Rights, Safety, and Health.**

135.     Mr. Fleetwood's September 21, 2021 Policy acknowledges that the COVID-19 shots resulted in breakthrough infections, which led the CDC to admit on August 5, 2021, weeks before Mr. Fleetwood issued his Order, that the COVID-19 shots did not prevent infection or transmission.

136.     Thus, Mr. Fleetwood issuing the Order to address the "'High' level of COVID-19 transmission…" in Whatcom County was reckless, willful, and with wanton disregard for the Plaintiffs' rights, health, and safety. (See Exhibit A, Executive Order, The Policy, p. 2)

[PROPOSED] SECOND AMENDED COMPLAINT                                              25

137.   Defendants claimed the Policy was due to an emergency but provided all employees more than two whole months (72 days) to receive the shot.

138.   The drugs were not FDA-labeled with a legal indication to treat, cure, or prevent any known disease.

139.   No manufacturer claimed their products would immunize any person from any COVID-19 variant.

140.   No manufacturer claimed their products would provide a person with any level of protection.

141.   The subject COVID-19 injections did not prevent transmission or infection.

142.   Pfizer's own data showed that nearly 16% of individuals had no protection at all, and others were failing at a rate of 6% every 60 days with an increasing rate of decline after being injected with the Pfizer-BioNTech COVID-19 Vaccine drug.

143.   The subject COVID-19 injections have resulted in numerous serious adverse events such as myocarditis, pericarditis, blood-clotting, strokes, seizures, immune system problems, and turbo cancer, among others.

144.   There were 94 drugs tracked by the Vaccine Adverse Event Reporting System (VAERS). The three mRNA drugs by Pfizer, Moderna, and Johnson & Johnson were reporting nearly 50% of all adverse events, including deaths, demonstrating the drugs were not safe and effective for all persons without an indication of who, what, or why it was not safe for some. Therefore, the Policy was reckless because it required all persons to be injected with an

[PROPOSED] SECOND AMENDED COMPLAINT                          26

investigational drug with HISTORIC rates [39] of adverse events at the time of the Policy's implementation.

145. The Policy was reckless because it destroyed the careers of Plaintiffs solely because they exercised their right to refuse without regard to the physical, legal, and financial implications of subjecting Plaintiffs to a legally binding agreement established by Congress regarding EUA and PREP Act medical products.

146. Individuals who consent to use federally funded COVID-19 EUA/PREP Act drugs must agree to the following terms and conditions, including but not limited to:

    A.    forfeiture of civil litigation rights under the Fourteenth Amendment resulting from injuries;[40]

    B.    allowing their private identifiable information to be collected and used for a variety of purposes by unknown persons;[41]

    C.    allow their involvement with the EUA product to be cataloged by various persons for unknown purposes,

    D.    allow the data collected about their adverse events to be utilized by researchers for unknown purposes and for eternity,[42]

    E.    assume greater risks to their safety, health, and legal rights.[43]

147. Mr. Fleetwood failed to inform Plaintiffs of those legal conditions[44] in an effort to compel Plaintiffs' participation under pretense.

---

[39] VAERS reported 1,562,008 entries from December 2020 through May 26, 2023, including 35,272 deaths (1.6 per hour) and 263,462 (12.11 per hour) serious injuries for the new and unvetted mRNA drugs.

[40] PREP Act forfeits all civil actions for damages in most situations.

[41] Each EUA and/or the CDC COVID-19 Vaccination Program Provider Program requires manufacturers and/or emergency stakeholders to obtain private identifiable information.

[42] Each EUA and/or the CDC COVID-19 Vaccination Program Provider Program requires manufacturers and/or emergency stakeholders to monitor, report and study a variety of adverse reactions to EUA products.

[43] 21 U.S.C. §360bbb-3 requires potential recipients to be made aware of the risks, alternatives, and the fact that the product is only authorized by the Secretary under emergency conditions. These elements provide potential recipients with the required information to make a quality and legally effective decision to consent. Therefore, consent means the individual agrees to assume more than minimal risk as defined in 21 CFR 50.3(k).

[44] The FDA informed Defendants that although the FDA approved COMIRNATY®, Defendants must ensure that in "[a]ll descriptive printed matter, advertising, and promotional material relating to the use of the Pfizer-BioNTech

### v.      Notices

148.    Defendants were provided notice of each EUA published in the Federal Register, informing them that they must "ensure" individuals are made aware of their right to accept or refuse an EUA product and to be educated about the voluntary nature of a PREP Act program.

149.    Defendants were notified that each product under the Policy was listed in the Federal Register as a PREP Act countermeasure.

150.    Defendants were notified that they, as emergency response stakeholders, had duties to comply with the EUA Statute.

151.    Defendants were notified that each of its vaccination providers was bound to the terms of the Provider Agreement requiring adherence to the EUA Statute's option to accept or refuse.

152.    All medical facilities offering the federally funded investigational COVID-19 drugs signed the Provider Agreement, under which the City, as the emergency response stakeholder, was obligated to ensure that those medical facilities complied with the duties required under the State-run CDC Program.

### E.      Plaintiffs' Injuries

153.    Plaintiffs were on a first-name basis with the entire city. They worked, toiled, sacrificed, raised their families, poured their heart out to the City, and enjoyed being part of it and its future.

---

COVID-19 Vaccine clearly and conspicuously shall state that: This product [Pfizer-BioNTech COVID-19 Vaccine] has not been approved or licensed by FDA, but has been authorized for emergency use by FDA, under an EUA to prevent Coronavirus Disease 2019 (COVID-19) for use in individuals 12 years of age and older" (emphasis added). All other EUAs for other COVID-19 drug manufacturers contained similar language.

[PROPOSED] SECOND AMENDED COMPLAINT                                    28

154.    However, Mr. Fleetwood did not consider the physical, emotional, legal or financial damage to Plaintiffs when he established an official Policy that unlawfully destroyed their lives.

155.    Plaintiffs incurred constitutional, financial, legal, [45] physical, and emotional damages by Mr. Fleetwood and the City of Bellingham solely because Plaintiffs refused to be injected with the federally funded COVID-19 EUA/PREP Act investigational drugs.

156.    Defendants segregated Plaintiffs, placed additional conditions upon them, terminated their employment, invaded their privacy, demoted them, or temporarily deprived them of their employment solely because they exercised their federal and state-secured rights to refuse the federally funded investigational drugs.

157.    Moreover, Plaintiffs incurred damages for refusing to surrender their due process rights (i.e., the right to seek judicial relief from damages), which is a prerequisite for any person using a PREP Act countermeasure.

158.    Plaintiffs lost houses, cars, educational endeavors, health insurance, vacations, retirement accounts, family goals, dignity, and the feeling of being equal in the City under the Fourteenth Amendment for the sole reason of exercising a statutory entitlement to refuse federally funded investigational drugs.

159.    Finally, Plaintiffs incurred damages for refusing to relinquish their fundamental rights of bodily integrity, privacy, equal protection, and due process when refusing drugs authorized under the EUA Statute, a right created exclusively for Plaintiffs' benefit, in which Defendants could not lawfully interfere.

---

[45] For the Plaintiffs who used the investigational drugs under duress and have developed or will develop an injury from the product's use, their due process rights to seek judicial relief have been deprived of them by an act of fraud by Mr. Fleetwood

[PROPOSED] SECOND AMENDED COMPLAINT                                                29

## VII.  LEGAL CLAIMS

160.    The facts described above constitute a deprivation of several rights guaranteed to Plaintiffs by the United States Constitution, federal statutes, and treaties.

161.    These deprivations are actionable under 42 U.S.C. § 1983 because the Defendants acted under color of state law when enacting and acting upon Executive Order involving federally funded COVID-19 EUA/PREP Act drugs.

162.    U.S. Supreme Court case law demonstrates that federal statutes and regulations with rights-conferring language are enforceable under 42 U.S.C. §1983.[46]

163.    Defendants were restricted from attempting to amend the above-referenced statutes, regulations, treaties, agreements, and contracts due to the Supremacy Clause Doctrine and express preemption language under the PREP Act.

164.    The Supremacy Clause Doctrine and the express preemption language in the PREP Act restrict states from allowing public and private employers to use laws, policies, or regulations to require individuals to be injected with EUA/PREP Act investigational drugs.

165.    This extends to any at-will employment law, doctrine, or custom an employer would otherwise claim as the right to engage in activity that conflicts with the EUA Statute or PREP Act (i.e., penalizing and/or terminating individuals who refuse an EUA/PREP Act investigational drug) or to rescind conditions established by Congress for Plaintiffs' benefit.

166.    The issues herein do not include whether a public or private employer can mandate the use of an FDA-licensed vaccine as a condition of public employment.

167.    Plaintiffs only claim the unqualified right to refuse a drug authorized under an EUA, listed as a countermeasure under the PREP Act.

---

[46] *Health and Hospital Corporation of Marion Cty. v. Talevski*, 599 U.S. 166 (2023)

[PROPOSED] SECOND AMENDED COMPLAINT                                      30

168.    Plaintiffs claim the fundamental right to refuse an investigational drug without pressure or penalty.

169.    Plaintiffs claim the fundamental right to refuse unwanted medical treatment.

170.    At all times material, Defendants' Policy exclusively relied upon federally owned COVID-19 drugs that were authorized under the EUA Statute, provided immunity under the PREP Act, and subject to the terms and conditions of the State-run CDC Program, and all applicable federal and state laws.

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – Deprivation of the Option to Refuse

171.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 170, as if fully set forth herein.

172.    The EUA Statute contains a required condition of the Secretary "to ensure that individuals to whom the product is administered are informed — 'of the option to accept or refuse administration of the product.'"[47]

173.    The products were under the PREP Act, which requires only voluntary use.

174.    The products were distributed through the Provider Agreement, requiring only voluntary use.

170.    Defendants were informed of their ministerial duty to accept Plaintiffs' chosen option under the EUA Statute at 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III), and as outlined in each EUA letter, which they breached when they issued a Policy mandating that Plaintiffs be injected with investigational drugs to keep their employment with the City.

---

[47] 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III)

[PROPOSED] SECOND AMENDED COMPLAINT                                    31

171.    Defendants   only   had   the   authority   to   inform   Plaintiffs   of   the
risks/benefits/alternatives to the product and of their right to accept or refuse the product.

172.    Defendants' official Policy usurped from Congress its authority to prohibit
involuntary participation by amending the "Conditions of Authorization"[48] to require mandatory
use of EUA investigational drugs.

173.    Defendants' official Policy exceeded their statutory and Constitutional authority
and unlawfully established prohibited acts under 21 U.S.C. § 331 (i.e., it became prohibited to
refuse the federally funded investigational drugs) and assigned penalties under 21 U.S.C. § 333
(i.e., termination of employment).

174.    At all times material, Defendants neither procured an FDA-licensed vaccine nor
informed Plaintiffs where, when, and how to obtain an FDA-licensed vaccine to comply with the
Policy.

175.    The Policy required Plaintiffs to use federally funded investigational drugs outside
of their free consent.

176.    Defendants compelled City employees (e.g., human resources, department
managers, Fire Chiefs, etc.) to enforce the Policy by unlawfully terminating Plaintiffs or otherwise
subjecting them to consequences for refusing EUA/PREP Act investigational drugs.

177.    The Policy was reckless, arbitrary, capricious, unlawful, and dangerous, and
Defendants acted with deliberate indifference to the legal rights, financial, physical, and emotional
well-being of Plaintiffs.

178.    The Policy, which required the use of federally funded EUA investigational drugs,
was adopted and executed under *ultra vires* authority.

---

[48] Exhibit E, 8/23/2021 EUA Letter, Section III

[PROPOSED] SECOND AMENDED COMPLAINT                                                    32

179.    Defendants were completely preempted by the Supremacy Clause and the express language of the EUA Statute from establishing a Policy requiring involuntary use of EUA products, because such a policy conflicts with the voluntary nature of a PREP Act program.

180.    The Policy, relying exclusively on the use of federally funded COVID-19 EUA/PREP Act investigational drugs, was *ultra vires*.

181.    The PREP Act completely preempted Defendants from establishing, enforcing, or continuing in effect with any law or legal requirement that was different from, or conflicted with, Plaintiffs' chosen option under the EUA Statute with respect to an EUA investigational drug.

182.    Defendants inserted themselves into the State-run CDC Program by requiring involuntary participation, which unlawfully and unconstitutionally eliminated the duty to obtain Plaintiffs' legally effective informed consent.

183.    As a direct and proximate result of the acts and omissions described herein, Plaintiffs suffered compensatory and special damages in an amount to be determined by a jury.

184.    The Defendants' actions described above, individually and/or collectively, acting under color of law, and in deprivation of the Constitutional rights and rights secured by the above federal statutes, unlawfully deprived Plaintiffs of their option to refuse under the EUA Statute, Provider Agreement, PREP Act, without penalty or pressure, thereby causing the damages described below.

### SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 – Deprivation of Equal Protection Rights

185.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 170, as if fully set forth herein.

186.    The Fourteenth Amendment to the U.S. Constitution guarantees equal protection of the laws.

187.    The EUA Statute contains a required condition of the Secretary "to ensure that individuals to whom the product is administered are informed — 'of the option to accept or refuse administration of the product.'"[49]

188.    The PREP Act requires only voluntary participation.

189.    All products listed for compliance with the Policy were authorized under the EUA Statute and listed as a countermeasure under the PREP Act.

190.    The U.S. Government, the State of Washington, COVID-19 drug manufacturers, CDC, FDA, HHS, emergency response stakeholders, and vaccination providers all agreed to offer the federally funded COVID-19 EUA/PREP Act drugs in accordance with "the voluntary nature of the program" as outlined by Congress in the PREP Act, EUA Statute, and CDC Program.

191.    The option to accept or refuse is a statutory entitlement exclusively created for Plaintiffs' benefit and represents equal options as established by Congress.

192.    Plaintiffs invoke the "class of one" doctrine,[50] as Plaintiffs were public employees and were discriminated against by Defendants when Defendants issued and enforced their unlawful Policy, depriving them of their constitutional rights and ability to access living wages with the City.

193.    Defendants only discriminated against those who chose the option to refuse and not those who chose the option to accept under the EUA Statute and PREP Act.

194.    Defendants' Policy treated a class of public employees who refused an EUA product differently than those who accepted it.

---

[49] 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III)
[50] "[W]e have explained that '[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' *Sioux City Bridge Co., supra,* at 445 (quoting *Sunday Lake Iron Co.* v. *Township of Wakefield,* 247 U. S. 350, 352 (1918))." *Village of Willowbrook v. Olech,* 528 U.S. 562 (2000)

195.    Defendants' Policy treated a class of public employees who refused a PREP Act covered countermeasure differently than those who accepted.

196.    Congress completely preempted Defendants from penalizing either option.

197.    Defendants violated their statutory and Constitutional obligations and deprived Plaintiffs of their option to refuse by terminating their public employment.

198.    Defendants' Policy, as applied, was outside of their authority to enact and enforce.

199.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, have deprived the Plaintiffs of their Fourteenth Amendment equal protection rights as described in the above facts, thereby causing them damages described below.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983 – Deprivation of Procedural Due Process Rights**

200.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 170, as if fully set forth herein.

201.    Plaintiffs had statutory entitlements[51] under the EUA Statute.

202.    First, Congress exempted the drugs from 21 U.S.C. § 355(a) (New drugs; Necessity of effective approval of application) during a declared emergency for Plaintiffs' benefit if Plaintiffs believed the drugs would help them achieve their personal health goals.

---

[51] "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it," and "Property interests, of course, are not created by the Constitution. Rather, they are created, and their dimensions are defined, by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in *Goldberg v. Kelly,* 397 U.S. 254 (1970), had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564 (1972)

203.    Second, Congress ensured Plaintiffs could access medical health counseling to learn about the risks/benefits/alternatives to the drugs without incurring a fee or coming under outside pressure to participate.

204.    Third, Congress provided Plaintiffs with the statutory entitlement to be informed of their right to accept or refuse the drug without a penalty or pressure.

205.    Plaintiffs had a statutory entitlement under the PREP Act to learn about the countermeasures and to choose whether to voluntarily use them.

206.    The PREP Act requires Plaintiffs to surrender their future litigation rights should they be injured by using the product or by its administration. Therefore, Congress required that all persons be informed of the "voluntary nature" of the program.

207.    The EUA Statute, the Provider Agreement, 10 U.S.C. § 980, and the State's FWA provide Plaintiffs with statutory and federal program entitlements to give their legally effective informed consent before being injected with federally funded investigational drugs, which they were deprived of by Defendants' Policy.

208.    At all times material, Defendant's Policy "destroyed" Plaintiffs' statutory entitlements without first providing them with "an opportunity to present [their] claim of entitlement."[52]

209.    Plaintiffs had a "unilateral expectation" to exercise their right to accept or refuse based on their autonomous health goals, and Defendants could not deprive Plaintiffs of their statutory entitlements under the statute and applicable laws, regulations, and contracts.

---

[52] *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982); see also *Wolff v. McDonnell*, 418 U.S. 539 (1974).

210.    Defendants owed Fourteenth Amendment obligations to Plaintiffs and could not deprive them of their statutory entitlements and terminate their property interest to public employment without "some form of hearing" *Wolff v. McDonnell*, 418 U.S. 539 (1974).

211.    Defendants' Policy, as applied, deprived Plaintiffs of their statutory entitlements without "the fundamental requisite of due process of law is the opportunity to be heard." *Louisville & Nashville R. Co. v. Schmidt*, 177 U. S. 230, 177 U. S. 236.

212.    Defendants' Policy, as applied, deprived Plaintiffs of their Constitutional right "to present [their] case and have its merits fairly judged." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982).

213.    At all times pertinent, because Plaintiffs exercised their right to refuse a federally funded COVID-19 EUA/PREP Act investigational drug, Defendants deprived Plaintiffs' of their Constitutional and statutory rights by requiring them to divulge their private health information, use investigational testing articles, and wear PREP Act masks without providing Plaintiffs with a date, time, place, or procedure to present their case and have their merits fairly judged by an impartial body.

214.    Defendants' Policy, as applied, was outside of Defendants' authority to enact and enforce. At all times material, Defendants had a ministerial duty to accept Plaintiffs' chosen option under the EUA Statute, PREP Act, and the State-run CDC Program.

215.    Breaching that duty, Defendants refused to provide procedural due process for Plaintiffs to air their complaints before their public employment was terminated.

216.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, have deprived the

Plaintiffs of their Fourteenth Amendment procedural due process rights as described in the above facts, thereby causing them damages described below.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – Substantive Due Process - Investigational Drug**

217.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 170, as if fully set forth herein.

218.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution guarantees the right to due process of law before infringing a citizen's interest in life, liberty, or property.

219.    The EUA Statute, 10 U.S.C. § 980, 45 C.F.R. Part 46, and the PREP Act clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

220.    The Supreme Court established a two-pronged approach[53] to analyze a substantive-due-process claim. First, analyze whether fundamental rights and liberties deeply rooted in this nation's history and tradition. *Moore v. East Cleveland*, 431 U. S. 494, (1977). Second, set forth a "careful description" of the asserted fundamental liberty interest. *Reno v. Flores*, 507 U. S. 292 (1993)

221.    Plaintiffs "careful description" of their asserted fundamental liberty interest is: Plaintiffs have a fundamental right to refuse an investigational drug without penalty or pressure.

222.    Regarding being deeply rooted, starting in 1938 (the FDC Act), the federal government prohibited drugs from being introduced into commerce before the FDA approved them for general marketing according to their labeling (21 U.S.C. § 355(a)). In 1974, Congress passed the National Research Act requiring an institutional review board to monitor research

---

[53] *Washington v. Glucksberg*, 521 U.S. 702 (1997)

[PROPOSED] SECOND AMENDED COMPLAINT                                                          38

activities involving humans and unapproved therapeutics and devices. In 1978, the Belmont Report was published and formed the basis of the Common Rule (45 C.F.R. Part 46). In 1992, the U.S. Senate ratified Article VII of the ICCPR Treaty. In 2001, the federal government required all persons conducting business with its agencies, departments, or the military to have an FWA on file before they use federal funding when involving humans with investigational medical products. The State of Washington has over 650 active FWAs out of 30,000 nationwide.

223.    Plaintiffs' stated fundamental right (to refuse an investigational drug without pressure or penalty) is akin to the recognized fundamental rights of bodily autonomy and integrity.

224.    The entire federal government's budget must filter through 45 C.F.R. § 46.122 (Use of Federal Funds), and DoD funding must filter through 10 U.S.C. § 980 (Limitation on use of humans as experimental subjects) when the funding involves humans with investigational drugs.

225.    Congress places strict requirements upon persons involving humans with investigational drugs under 21 U.S.C. 321, 331, 351, 352, 355, 360bbb *et. seq.*, and 371; 42 U.S.C. 262; 10 U.S.C. § 1107; 45 C.F.R. Part 46; 21 C.F.R. §§ 50,56; Article VII ICCPR Treaty; 21 C.F.R. Part 312; and the Belmont Report.

226.    The primary requirement of the statutes, agreements, and treaties is that a person offering a federally funded investigational product must ensure that the potential recipient is never under outside pressure to participate, such as "sanctions," "coercion," "undue influence," and "unjustifiable pressures."

227.    The right to refuse an investigational drug is a fundamental right that is pervasive, historical, and deeply rooted in the $600B pharmaceutical research industry and this nation.

228. No constitution, statute, regulation, or treaty provides any person authority to require another person to be injected with an investigational drug under threat of penalty or by pressure.

229. Defendants subjected Plaintiffs, under threat of penalty, to investigational drug use as a condition to start or continue public employment.

230. The only drugs available to Plaintiffs for complying with Defendants Policy were FDA-classified as investigational, including (1) Pfizer-BioNTech COVID-19 Vaccine under IND application 19736, (2) Moderna COVID-19 Vaccine under IND application 19745, (3) and Janssen COVID-19 Vaccine under IND application 22657.

231. Defendants committed a substantive due process violation when they deprived Plaintiffs of their fundamental right to refuse an investigational drug without penalty or pressure.

232. Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, constituted a substantive due process violation when they deprived the Plaintiffs of their fundamental right to refuse an investigational drug as described in the above facts, thereby causing Plaintiffs to sustain the damages described below.

### FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – Substantive Due Process -- PREP ACT

233. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 170, as if fully set forth herein.

234. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution guarantees the right to due process of law before infringing a citizen's interest in life, liberty, or property.

[PROPOSED] SECOND AMENDED COMPLAINT                    40

235.   The PREP Act (42 U.S.C. §§247d-6d,6e) and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

236.   The PREP Act clearly requires a person to forfeit their constitutional right to seek judicial relief if injured by a covered countermeasure or its administration.

237.   Congress expressly preempted Defendants from establishing a legal requirement for public employees to participate in an activity or use a countermeasure under the PREP Act.

238.   Plaintiffs have a statutory entitlement to seek judicial relief from injury (i.e., due process), but they are required to voluntarily surrender that right if they choose to participate in a PREP Act program.

239.   Defendants' Policy deprived Plaintiffs of their Fourteenth Amendment substantive due process rights when issuing the Policy exclusively relying on products listed as countermeasures under the PREP Act.

240.   Defendants' Policy, as applied, was outside of Defendants' authority to enact and enforce. At all times material Defendants had a ministerial duty to accept Plaintiffs' chosen option under the PREP Act, and the State-run CDC Program.

241.   Breaching that duty, Defendants deprived Plaintiffs' due process rights.

242.   The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, have deprived the Plaintiffs of their substantive due process rights under the PREP Act as described in the above facts, thereby causing them damages described below.

**SIXTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – Substantive Due Process – Unwanted Medical Treatment**

243.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 170, as if fully set forth herein.

[PROPOSED] SECOND AMENDED COMPLAINT                                       41

244.     The subject COVID-19 injections are not safe and do not prevent transmission or infection.

245.     The subject COVID-19 injections do not qualify as "vaccines."

246.     The subject COVID-19 injections only qualify as "medical treatment."

247.     Plaintiffs have a fundamental right to refuse unwanted medical treatment.

248.     Defendants' Policy, as applied, deprives Plaintiffs of the fundamental right to refuse unwanted medical treatment.

249.     Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, manipulated the Constitutional rights of Plaintiffs out of existence as described in the above facts, thereby causing them damages described below.

**SEVENTH CAUSE OF ACTION**
**Unconstitutional Conditions Doctrine - 42 U.S.C. § 1983**

250.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 170, as if fully set forth herein.

251.     "…[T]he state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence."

*Frost Trucking Co. v. R.R. Com*, 271 U.S. 583, 593-94 (1926)

252.     Defendants' Policy established an unconstitutional condition because it required Plaintiffs to surrender their Fourteenth Amendment rights (i.e., due process, privacy, equal protection, public employment, property interests) as a condition of continued public employment.

253.     Therefore, Defendant's Policy used the PREP Act, EUA Statute, and the State's CDC program as "procedural device[s]" to "produce a result which the [mayor and city] could not command directly"[54]

254.     Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, manipulated the Constitutional rights of Plaintiffs out of existence as described in the above facts, thereby causing them damages described below.

## EIGHTH CAUSE OF ACTION
### 42 U.S.C. § 1983- Deprivation of Right of Privacy

255.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 170, as if fully set forth herein.

256.     The Fourteenth Amendment provides a fundamental liberty interest in the right of privacy from unwanted, unwarranted, and unjustified governmental intrusion.

257.     The right to autonomously choose whether to use an investigational drug is a fundamental privacy right held by Plaintiffs, which Defendants were not authorized by law, constitution, or emergency protocols to deprive.

258.     Defendants required Plaintiffs to involuntarily surrender their Private Health Information to the City's human resources department if and when one of the investigational drugs was injected into their bodies.[55]

---

[54] *Perry v. Sindermann*, 408 U.S. 593 (1972) quoting *Speiser v. Randall*, 357 U.S. 513 (1958)
[55] Exhibit A, Executive Order, The Policy, see Section 3

[PROPOSED] SECOND AMENDED COMPLAINT                                       43

259.    Defendants acted with moral turpitude by enacting a Policy allowing government employees and private contractors to continually invade the privacy rights of Plaintiffs in violation of the Fourteenth Amendment rights to privacy.

260.    Defendants' Policy, as applied, was outside of Defendants' authority to enact and enforce. The City could not invade Plaintiffs' privacy rights by continually asking them when and if they would take the shot.

261.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, unconstitutionally invaded Plaintiffs' Fourteenth Amendment right to privacy, thereby causing them damages described below.

**NINTH CAUSE OF ACTION**
**42 U.S.C. § 1983- *Monell* Liability**

262.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 170, as if fully set forth herein.

263.    The City of Bellingham Municipality Code provides that the Mayor (1) "shall be the chief executive and administrative officer of the City with the prime responsibility of coordination and supervision of the activities of all departments and employees of the City,"[56] and (2) has the authority to "[m]ake and issue orders which shall have the force of law on matters reasonably related to the protection of life and property as affected by such disaster."[57]

264.    The Policy established by Mr. Fleetwood constitutes the official policy of the City and was the moving force behind, and caused, Plaintiffs' damages.

265.    The City of Bellingham knew of its ministerial duty under the CDC Program, Provider Agreement, and EUA Statute to accept Plaintiffs' option under the EUA Statute and

---

[56] Article 4.01 of the Bellingham City Charter
[57] BMC 2.57.060

[PROPOSED] SECOND AMENDED COMPLAINT                                              44

willfully ignored that duty when penalizing Plaintiffs for choosing an option the City disagreed with.

266.    The act of penalizing Plaintiffs was an *ultra vires* discretionary act preempted by the Supremacy Clause and express preemption language under the PREP Act.

267.    The City, acting by and through its Mayor, Seth Fleetwood, made a deliberate and conscious decision to disregard the known health risks of the federally funded investigational drugs when establishing and enforcing the Policy.

268.    The City, acting by and through its Mayor, Seth Fleetwood, made a deliberate and/or conscious decision to deprive the known legal rights of Plaintiffs regarding the federally funded EUA investigational drugs when establishing and enforcing the Policy.

269.    The City, acting by and through its Mayor, Seth Fleetwood, made a deliberate and/or conscious decision to deprive the known rights of Plaintiffs under the PREP Act when establishing and enforcing its Policy.

270.    The City, acting by and through its Mayor, Seth Fleetwood, made a deliberate and/or conscious decision to deprive the known rights of Plaintiffs under each EUA when establishing and enforcing its Policy.

271.    The City, acting by and through its Mayor, Seth Fleetwood, made a deliberate and/or conscious decision to subject Plaintiffs to investigational drug use outside of Plaintiffs' free consent.

272.    The City, acting by and through its Mayor, Seth Fleetwood, made a deliberate and/or conscious decision to require Plaintiffs to surrender their Fourteenth Amendment rights to privacy, equal protection, and due process as a condition of public employment with the City.

[PROPOSED] SECOND AMENDED COMPLAINT                                45

273.   The City, acting by and through its Mayor, Seth Fleetwood, made a deliberate and/or conscious decision to subject Plaintiffs to the legal conditions established by Congress under the EUA Statute and PREP Act as described in ¶ 146, *supra*.

274.   Starting on September 21, 2021, and continuing through the filing of this Complaint, the City of Bellingham, with deliberate indifference to the rights of Plaintiffs, tolerated, permitted, and willfully allowed its employees to subject Plaintiffs to nonconsensual investigational drug use by applying penalties and pressure for noncompliance with its official Policy.

275.   The City of Bellingham had knowledge of each EUA and countermeasure published in the Federal Register and its obligation to perform ministerial duties under the EUAs.

276.   The City of Bellingham had the power and obligation to terminate the Policy before depriving Plaintiffs of their statutory and constitutional rights.

277.   By refusing to terminate the Policy, the City of Bellingham caused its supervisory employees to act with impunity and without fear of retribution when violating federal law by subjecting Plaintiffs to nonconsensual investigational drug use offered under a federal program.

278.   The City of Bellingham knew of its legal duties under each EUA as the emergency response stakeholder and willfully violated those duties when establishing and enforcing its Policy.

279.   The City of Bellingham knew that it was expressly preempted by the EUA Statute and PREP Act from interfering in the federal goals of voluntary use of the statute's authorized drugs, biologics, and devices and willfully violated its duty not to interfere when establishing and enforcing its Policy.

280.   When enforcing its Policy, the City of Bellingham willfully deprived Plaintiffs of their Constitutional right to Privacy under the Fourteenth Amendment.

[PROPOSED] SECOND AMENDED COMPLAINT                                    46

281.   The City of Bellingham willfully deprived Plaintiffs of their Constitutional right to Equal Protection under the Fourteenth Amendment when enforcing its Policy.

282.   When enforcing its Policy, the City of Bellingham willfully deprived Plaintiffs of their Constitutional right to procedural and substantive Due Process under the Fourteenth Amendment.

283.   The City of Bellingham willfully deprived Plaintiffs of their federal right to refuse the EUA/PREP Act products without incurring a penalty or losing a benefit to which they were otherwise entitled.

284.   At all times material, the City of Bellingham concealed from Plaintiffs their right to refuse the mandated medical products without penalty or pressure.

285.   The City of Bellingham's official Policy, as applied, was outside the City's authority to enact and enforce. At all times, the City had a ministerial duty to accept the Plaintiffs' chosen option under the EUA Statute, PREP Act, and the State-run CDC Program but recklessly violated its ministerial duty by requiring that which the U.S. Congress prohibits—involuntary participation.

286.   Plaintiffs' damages are a direct and proximate result of the acts and omissions of the City of Bellingham.

287.   As a direct and proximate result of the acts and omissions described herein, Plaintiffs suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

288.   The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, deprived Plaintiffs' constitutional privacy rights, thereby causing them damages described below.

**TENTH CAUSE OF ACTION**
**Against Defendant City of Bellingham**
**Wrongful Termination**

289.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 170, as if fully set forth herein.

290.    As demonstrated above, Plaintiffs possessed and exercised a statutory right to refuse the administration of an EUA/PREP Act investigational drug and the fundamental rights to refuse an investigational drug and to refuse unwanted medical treatment.

291.    Because Plaintiffs exercised their statutory right to refuse to be injected with an EUA/PREP Act drug, and their fundamental rights to refuse investigational drugs and to refuse unwanted medical treatment, the City of Bellingham took adverse actions against Plaintiffs, including, but not limited to, suspension without pay, forced retirement, forced resignation, and termination.

292.    When the City of Bellingham terminated Plaintiffs' employment for refusing to use a PREP Act countermeasure or accept an EUA drug, and for exercising their fundamental rights to refuse investigational drugs and to refuse unwanted medical treatment, it violated Washington's common law[58] that provides Plaintiffs with the authority to exercise a federal or legal right without losing employment when doing so.[59]

293.    The federal right was the right to refuse  products under each statute without penalty or pressure, in which Defendants were expressly preempted from interfering, and the rights to refuse investigational drugs and to refuse unwanted medical treatment.

---

[58] *Becker v. Community Health Systems*, 184 Wn.2d 252, 359 P.3d 746 (2015); *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 358 P.3d 1159 (2015), and *Rickman v. Premera Blue Cross*, 184 Wn.2d 300, 358 P.3d 1153 (2015)
[59] *Becker v. Community Health Systems*, 184 Wn.2d 252, 359 P.3d 746 (2015); *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 358 P.3d 1159 (2015), and *Rickman v. Premera Blue Cross*, 184 Wn.2d 300, 358 P.3d 1153 (2015)

294.     As a direct result of Defendants' adverse employment actions against them, Plaintiffs sustained and seek recovery of and for the following: loss of pay (front pay and back pay); loss of seniority; loss of promotions; loss of training and advancement; loss of benefits; loss of accumulated sick pay, vacation, compensatory time, and/or paid time off; negative tax consequences (in the event of a lump sum award), including related accountant fees; attorney's fees; emotional distress; mental, psychological and physical harm; loss of income; loss of enjoyment of life; and compensatory, punitive, exemplary, legal, equitable, nominal and all other damages that this Court deems necessary and proper.

## ELEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

295.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 170, as if fully set forth herein.

296.     When the United States Congress refused to allow Defendants to apply penalties to Plaintiffs who refused the EUA/PREP Act COVID-19 investigational drugs, Defendants engaged in a scorched-earth policy and inflicted, with malicious intent, emotional distress to the fullest extent that one in their positions of authority and power could inflict, all to the detriment of Plaintiffs' emotional well-being.

297.     The Defendants' conduct, committed with gross negligence, recklessness, or intent, as described above, gives rise to a claim of outrageous conduct and intentional infliction of emotional distress under the common law of the State of Washington against the Defendants for the damages described below.

## VII.  DAMAGES RECOVERABLE AND DEMANDED

298.     The following paragraphs are hereby incorporated by reference into Causes of Action One through Ten, as if set forth here *in extenso*.

[PROPOSED] SECOND AMENDED COMPLAINT                                              49

299.    As a direct and proximate result of the Defendants' unreasonable and unlawful actions, Plaintiffs have suffered past damages and will suffer future damages, both compensatory and general, including, but not limited to, front and back pay; loss of benefits; loss of accumulated sick pay; loss of retirement accounts; lost earnings on retirement funds; vacation time, compensatory time, and paid time off; negative tax consequences (in the event of a lump sum award), including related accountant fees; attorney's fees; emotional distress; mental, psychological and physical harm; loss of income; loss of enjoyment of life; for which defendants are liable in compensatory, punitive, exemplary, legal, equitable, and all other damages that this Court deems necessary and proper.

300.    When the Defendants' behavior reaches a sufficient threshold, punitive damages are recoverable in § 1983 cases. *Smith v. Wade*, 461 U.S. 30 (1983). Because Defendants' actions were intentional and willful, Plaintiffs are entitled to, and hereby demand, an award of punitive damages against each Defendant in an amount sufficient to deter them, individually and collectively, from repeating their unconstitutional actions.  *Smith v. Wade*, 461 U.S. 30 (1983).

301.    Because Defendants' actions involved reckless or callous indifference to the Plaintiffs' federally protected rights, Plaintiffs are entitled to, and hereby demand, an award of punitive damages against each Defendant in an amount sufficient to deter them, individually and collectively, from repeating their unconstitutional actions.  *Smith v. Wade*, 461 U.S. 30 (1983).

302.    Because Defendants' actions were motivated by evil motive or intent, Plaintiffs are entitled to, and hereby demand, an award of punitive damages against each Defendant in an amount sufficient to deter them, individually and collectively, from repeating their unconstitutional actions. *Smith v. Wade*, 461 U.S. 30 (1983).

303.    Plaintiffs seek recovery of attorneys' fees under the Civil Rights Attorney's Fees Awards Act of 1976 and 42 U.S.C. § 1988, and under any other provision of law or basis.

304.    Plaintiffs seek recovery of all court costs and out-of-pocket litigation expenses, including but not limited to expert fees, as well as legal interest on any amount of damages awarded.

### VIII.  JURY TRIAL DEMANDED

305.    Plaintiffs are entitled to, and hereby demand, a trial by jury on all issues of fact.

Respectfully submitted,

**SCHEXNAYDRE LAW FIRM**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8TH day of October, 2024, I presented the foregoing pleading to the Clerk of Court for filing and uploading to the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ David J. Schexnaydre
DAVID J. SCHEXNAYDRE

BY:   /s/ David J. Schexnaydre
DAVID J. SCHEXNAYDRE, T.A.
Louisiana Bar Roll #: 21073
2895 Highway 190 • Suite 212
Mandeville, Louisiana 70471
Telephone: (985) 292-2020
Fax: (985) 235-1089
Email: david@schexnaydre.com
Lead Counsel for Plaintiffs-*Pro Hac Vice*

And

/s/ Charice Holtsclaw
CHARICE HOLTSCLAW, ESQ.
WSBA# 53850
301 Prospect St.
Bellingham, WA 98225
Phone: (816) 842-6700
Email: holtsclaw.law@gmail.com
Local Counsel for Plaintiffs

Deleted: 30th
Formatted: Superscript
Deleted: June